**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| MACIE J. WAGONER, INDIVIDUALLY | * | CIVIL ACTION NO. :  09-07257 |
| AND AS THE LEGAL REPRESENTATIVE | * | |
| OF JAMES WAGONER, JR. | * | SECTION "L(3)" |
| | * | |
| VS. | * | JUDGE:  ELDON E. FALLON |
| | * | |
| EXXONMOBIL CORPORATION, ET AL. | * | MAGISTRATE:  DANIEL KNOWLES, III |

**DEFENDANT RADIATOR SPECIALTY COMPANY'S**
**OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE TESTIMONY**
**OF DEFENDANTS' INDUSTRIAL HYGIENIST, JOHN SPENCER, CIH, CSP**

Radiator Specialty Company (hereinafter "Radiator") submits this Opposition to Plaintiff's Motion to Exclude Testimony of Defendant's Industrial Hygienist, John Spencer, CIH, CSP ("Plaintiff's Motion") (Document 135).

**I.     INTRODUCTION.**

Throughout Plaintiff's Motion, Plaintiff misconstrues and misquotes Mr. Spencer's testimony by selectively and incompletely citing to references in his report and statements in his deposition. Defendant denies all of Plaintiff's contest to the qualifications and methodology of Mr. Spencer.

In his report, Mr. Spencer opined:

1.     Actual air monitoring studies of standard and real world practices using Liquid Wrench found airborne benzene levels below historical and current occupational health standards and guidelines.

2.     Application of the plaintiff's industrial hygiene expert's mathematical modeling, using corrected input variables, for determining inhalation exposure, resulted in a cumulative inhalation benzene exposure of 0.81 ppm-years for Mr. James Wagoner. This cumulative exposure dose was well below the current and former benzene health standards.

3.     Plaintiff's expert, Dr. Kura, used an invalidated dermal flux model to calculate Mr. Wagoner's dermal exposures from using Liquid Wrench. Dermal modeling applied for purposes of calculating occupational

exposure dose is not a validated, standardized or accepted industrial hygiene method for evaluating an individual's exposures to volatile mixtures for comparison to occupational exposure limits. Importantly, Dr. Kura's dermal exposure methodology for calculating dermal exposures to benzene from mixtures containing variable volumes of benzene has not been validated and therefore, his dermal exposure calculations are neither relevant nor reliable. There is no occupational health standard based on the dermal modeling method.

4.     When developing the occupational health standards and guidelines, OSHA and other standard and guideline-setting agencies accounted for the dermal route of exposure and used the inhalation route of exposure as the surrogate for both dermal and inhalation exposures.[1]

In response to Plaintiff's Motion, it is noteworthy to again bring to the Court's attention that Plaintiff did not produce the post-deposition sham "affidavit" of Eric Williams of March 15, 2011, until after the deadline for Defendant's expert reports. Without this sham affidavit, Plaintiff's expert, Dr. Kura, could not have prepared his report.[2]

## II.   JOHN SPENCER IS A HIGHLY QUALIFIED CERTIFIED INDUSTRIAL HYGIENIST.

As demonstrated in his deposition[3] and curriculum vitae,[4] John Spencer is a certified industrial hygienist and certified safety professional.[5]  Mr. Spencer has a degree in Biological Science with work experience at the National Institute for Occupational Safety and Health and was Director of Industrial Hygiene and Occupational Health Program for the United States Coast Guard, 5th District, Portsmouth, Virginia.[6]  Mr. Spencer's work experience in the field of Industrial Hygiene spans approximately 30 years.[7]  Mr. Spencer has extensive experience in

---

[1]  Exhibit C, Report of John Spencer dated May 3, 2011, p. 31.
[2]  See Radiator's Motion to Exclude Sham Affidavit and Motion to Exclude Plaintiff's Expert, Bhaskar Kura (Document 149).
[3]  Exhibit A, Deposition of John Spencer (6/22/11).
[4]  Exhibit B, Curriculum Vitae of John Spencer.
[5]  Exhibit A, Spencer Deposition, 9:13-18.
[6]  Exhibit A, Spencer Deposition 121:8-124:8)
[7]  Exhibit B, Curriculum Vitae of John Spencer.

hands-on, in the field exposure, measurement and assessment.[8] In addition to Mr. Spencer's extensive work experience, he is a member of several professional societies and has held prominent offices in Industrial Hygiene organizations.[9]  Mr. Spencer has made numerous expert presentations and authored publications in the field of industrial hygiene, including publications dealing directly with benzene exposure assessment and has, in accordance with his opinions in this matter, published with Dr. Pamela Williams, an article addressing "Dermal Absorption of Benzene in Occupational Settings Estimating Flux and Applications for Risk Assessment."[10]

## III.   MR. SPENCER'S OPINIONS AND CALCULATIONS ARE IN CONFORMITY WITH THE LEGAL STANDARD.

Radiator denies Plaintiff's statement that Mr. Spencer's opinions are not based upon reliable scientific methods and principles under the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* and Rule 702 of the Federal Rules of Evidence.  Mr. Spencer reviewed the testimony and documents and used generally accepted valid methodology in his calculations and in truthfully rendering his opinions and in addressing the various standards of OSHA, NIOSH, and ACGIH in his report.[11]

## IV.   MR. SPENCER'S TESTIMONY AND REPORT ARE CONSISTENT: PLAINTIFF'S MEMORANDUM DOES NOT DISCLOSE MR. SPENCER'S COMPLETE ANSWER.

In response to Plaintiff's Memorandum, Section IV, Air Monitoring of Liquid Wrench, contrary to Plaintiff's assertions, Mr. Spencer's testimony in no way contradicts his conclusion that Liquid Wrench would not produce levels of benzene in excess of the OSHA eight-hour time-weighted average of 1 ppm.  Plaintiff selectively quotes the following testimony:[12]

---

[8] Exhibit A, Spencer Deposition, 123:15-124-8; and Exhibit B, Spencer CV.

[9] Exhibit A, Spencer Deposition, 124:9-125:5; and Exhibit B, Spencer CV.

[10] Exhibit A, Spencer Deposition 125:6-126:9; and Exhibit B, Spencer CV.

[11] Exhibit A, Spencer Deposition, 126:10-130:11; and Exhibit C, Spencer Report.

[12] Plaintiff's Memorandum (Doc. 135-1), pp. 4 and 5.

Q:      Okay. And I'm asking you a general question.  Could someone using this product from 1972 to 1978 be exposed to levels of benzene above 1 past 5 per million?

A.      You—you can for short durations, yes.  As an—as an 8-hour time-weighted average, based on the normal and intended and typical use of the product, I'd say no.[13]

This answer in no way contradicts Mr. Spencer's opinion.  However, in Plaintiff's next

recitation of Mr. Spencer's testimony, Plaintiff edits and neglects to include pertinent testimony:

Q.      Okay, Mr. Spencer, I'd like you to turn in the book to a memo by Jim Wells regarding benzene in Liquid Wrench.  It's dated October 27, 1978 to Herman Blumenthal.

Q:      Have you ever seen this memo before?

A:      I may have at some point in the past.

Q:      Does this document demonstrate that individuals filling cans of Liquid Wrench were exposed to 25.4 parts per million and up to 29 parts per million?

A:      I'm not sure what this was.  It looks like it's at their manufacturing facility where the product is being handled in large volumes.

Q:      All right.  And again, the same question.  Does it demonstrate that levels from Liquid Wrench of benzene exposure reached up to 29 parts per million?

[Objection to form.]

A:      Well, it says 24.5.  Oh.  I'm sorry.  Yes, it was measured at 29 parts per million.  I—I—it's—this is not relevant to someone using Liquid Wrench in a squirt can, but—so, I don't know all the background to this data set to comment on it properly.

[By Mr. Williams]

Q:      Well, Mr. Spencer, the last line says "Therefore, it is evident that we are still exceeding the limit by threefold and could not possibly revert back to the Drip Oil formula without breaking the law."  Do you see that statement?

A:      I—I do.

Q:      And do you agree that they are discussing the formula with raffinate as a potential to emit 24.5 parts per million up to 29 parts per million

[Objection; form]

The Witness:  As I--again, I don't have enough information, but as I read this, in their facility, that may be the case in where it's used in massive quantities, but not in the application where it's used in the field.

[By Mr. Williams]

Q:      Okay.  And if I told you a corporate rep has testified before that this was the—situation for these testings was when they were filling the cans with Liquid Wrench?

[Objection; form]

The Witness:  That may be the case . . .[14]

---

[13] Exhibit A, Spencer Deposition, 38: 1-9.

[14] Plaintiff Memorandum (Doc. 135-1), pp. 4 and 5.

Plaintiff does not advise the Court of Mr. Spencer's continuing testimony:

> . . .but again, you know, what's the volume of material, how long was it occurring, what was the sampling method? I—there's just more detail here that I need.
> I can speak to the air monitoring for people using Liquid Wrench, and I—and I know what those levels of exposure are using Liquid Wrench in the same form that Mr. Wagoner did. [15]
>
> [By Mr. Williams]
> Q.     Mr. Spencer—correct me if I'm wrong—is this the only piece of historical monitoring data that we have?
> [Objection to form]
> The Witness:  I don't know if it's the only historical data that we have . . .
>
> [By Mr. Williams]
> Q:     Are there any other test results showing the levels of Liquid Wrench—levels of benzene coming off of Liquid Wrench from 1972 to '78 that you're aware of?
> A:     I am not. [16]

Mr. Spencer was appropriately pointing out that the memorandum of October 27, 1978,[17] on its face, reflects that the "room" where raffinate formula Liquid Wrench was being manufactured on an assembly line. The test report from Hartford discussed in this memo did not concern an individual using Liquid Wrench, like Mr. Wagoner. The result was obtained from a sampling device attached directly to an operator in the actual room where production occurred.[18]

The air monitoring data taken at the Radiator Specialty facility cited by Plaintiff is neither relevant nor representative of Mr. Wagoner's alleged use of Liquid Wrench by applying small amounts to bolts using a squirt can.   A basic industrial hygiene principle when using air monitoring data taken on other workers is to apply the data to other workers who fall into a Similar Exposure Group (SEG).  According to the AIHA, a Similar Exposure Group (SEG) is

---

[15] Exhibit A, Spencer Deposition, 40:21-41:7.

[16] Plaintiff's Memorandum (Doc. 135-1), p. 5

[17] Exhibit D, memorandum to Herman Blumenthal from Jim Wells dated October 27, 1978.

[18] Exhibit E, Deposition of James Wells, *Oakley v. Radiator Specialty* (11/6/2008), 169:7-172:1.

defined as "A group of workers having the same general exposure profile for an agent because of the similarity and frequency of the task(s) they perform, the similarity of the materials and processes with which they work, and the similarity of the way the perform the task(s)."[19]

To state that the air monitoring data taken during the tasks of filling of Liquid Wrench cans at the Radiator Specialty facility is representative of Mr. Wagoner's auto mechanic operations is patently false. Mr. Wagoner would have had to be doing the same task, in the same way, in the same environmental conditions, at the same frequency, with the same material. Mr. Wagoner was not filling cans of Liquid Wrench, was not in the same environment that the filling was completed, nor was he handling the same quantity of material that would have been handled in the Radiator Specialty facility. In fact, there is nothing in common between the tasks performed at the Radiator Specialty facility and what tasks Mr. Wagoner performed while using the product except that the material _may_ have been a similar product. Therefore, the air monitoring data from the Radiator facility is not representative of the exposure that Mr. Wagoner may have encountered while using the Liquid Wrench product as a mechanic and therefore was not considered in his exposure assessment.

## V.    MR. SPENCER'S CRITICISM OF DR. KURA'S METHODS IS CONSISTENT.

In response to Plaintiff's Memorandum, Section V, Plaintiff accuses Mr. Spencer of contradicting the criticism he made of Dr. Kura's benzene inhalation modeling for Liquid Wrench. Plaintiff's statement is incorrect. Plaintiff misapplies dates of test data. Plaintiff states "[h]e confirmed that the U.S. Steel product specification sheet for raffinate stated that raffinate contained a minimum of 5% benzene, and may contain up to 14% benzene." Plaintiff's reference to a minimum of 5% benzene in raffinate was from 1963 document, not during the

---

[19] Exhibit C, Spencer Report, p. 6, ¶ 2.

time period in question for Mr. Wagoner, the 1970s.[20]   Plaintiff does not address that the analysis of the benzene content of raffinate in 1977 provided by the supplier, U.S. Steel, stating an average of benzene content of 3%.[21]   Accordingly, Mr. Spencer's assumption that the raffinate formula of benzene content of 4.39% considered all of the analysis information available. Unlike Plaintiff's expert, Dr. Kura, Mr. Spencer did not "cherry pick" data.

Plaintiff also states that "Mr. Spencer acknowledges that one laboratory test result found 30% benzene in Liquid Wrench. In spite of his knowledge of this evidence, Mr. Spencer's calculations failed to include not only the 14% test result, but the 30% results as well."[22] Plaintiff's statement is misleading and inaccurate.  As admitted by Plaintiff's expert, Dr. Kura, there has <u>never</u> been a test result of 14% benzene content in Liquid Wrench or a 30% test result of benzene in Liquid Wrench, other than an outlier test conducted at Mobil, in 1977, which found 30% benzene in Liquid Wrench. This test was discredited approximately two weeks later by additional testing by Mobil.[23]   Plaintiff's expert, Dr. Kura, could not identify a single document or test which found 15% or 30% benzene in Liquid Wrench other than this one discredited outlier test which was never validated by any source.[24]

As Mr. Spencer stated in his report, the 30% benzene in Liquid Wrench value, cited in the first Mobil test memo, was not substantiated by any other testing.  In fact, a follow-up analysis of the Liquid Wrench approximately two weeks later indicated a value of 7% benzene. In all of the documents discussing benzene content in either the Liquid Wrench or the Raffinate, only this single document, an unsubstantiated and discredited test, suggests a value of 30%.

---

[20] Exhibit A, Spencer Deposition, 35:8-18.
[21] Exhibit F, WAG-RAD 000016.
[22] Plaintiff's Memorandum (Doc. 135-1), p. 6.
[23] Exhibit G, Deposition of Bhaskar Kura, Ph.D., P.E. (5/10/11) and Exhibit C, Spencer Report p. 19.
[24] Exhibit G, Kura Deposition, 225:9-227:13.

The Plaintiff argues that Mr. Spencer did not include the 14% test result.  The document the Plaintiff references is from U.S. Steel (Exhibit E of the Plaintiff's motion) and stated a range of 1%-14% with an average value of 3% in the Raffinate, resulting in a value of 2.6% benzene in Liquid Wrench,[25] a value <u>five times less</u> than what the Plaintiff claims was in the Liquid Wrench and lower than what Mr. Spencer used in his exposure assessment.  All the other documents suggest a value for percent benzene in the Raffinate in the range of 5% or less.[26]  The data suggests a reasonable value for benzene in Raffinate to be around 5% or 4.39%, not the artificially inflated 13.81% as created by Dr. Kura's use of a single, unsubstantiated, and discredited test result.

Plaintiff suggests that Mr. Spencer excluded relevant evidence regarding the concentration of benzene in the Liquid Wrench.  The data point not considered by Mr. Spencer was the 30% value which is clearly not representative of the concentration of benzene in the Liquid Wrench.  In contrast, Plaintiff ignored the data which indicated considerably lower levels of benzene in the raffinate and resulting Liquid Wrench."[27]

## VI.    CORRECT RAFFINATE CONTENT OF LIQUID WRENCH.

Plaintiff makes the statement "[i]n contrast, Dr. Kura calculated an average of 13.81% for the benzene content of the Liquid Wrench used by Mr. Wagoner."[28]  As Mr. Spencer further explained, with U.S. Steel's representation in 1977 that Raffinate had a maximum content of 14% benzene, comparing that to the percentage of Raffinate within the product, Liquid Wrench,

---

[25] Exhibit F, WAG-RAD 000016.
[26] Exhibit C, Spencer Report, p. 19, ¶ 4.
[27] Exhibit F, WAG-RAD 000016.
[28] Plaintiff's Memorandum (135-1), p. 6.

it is mathematically <u>impossible</u> to even achieve 13.81% which Dr. Kura calculated as an average.[29]

## VII.   DR. MEHLMAN'S ARTICLE.

Plaintiff's statement that "Spencer criticizes the use of the 30% figure by Dr. Kura, but admits that it is from a peer reviewed published paper which reported 30% (300,000 ppm) as the benzene content of Liquid Wrench" is also wholly inaccurate. The author of the article, Myron Mehlman, was the employee of Mobil who initially received the test report of 30% benzene content of Liquid Wrench in 1977 but did not actually do the test. The subsequent test by Mobil revealed that the 30% test he discussed in that article was not accurate.[30]

## VIII.   METHODOLOGY VERSUS APPLICATION.

Plaintiff's second statement in Section V of her Memorandum, pp. 6 and 7, that "Mr. Spencer admits that the use of the near field/far field model by Dr. Kura to calculate the inhalation exposure to benzene from Liquid Wrench and Varsol is an acceptable peer reviewed methodology," is misleading.   Mr. Spencer acknowledged that the model was an appropriate method but stated that Dr. Kura did not use the model properly. Mr. Spencer stated when addressing Dr. Kura's methodology—"[w]ell, no, I don't think I opine that the methods that he used were incorrect.  He used a near-field/far field model which I do not disagree with. I don't think he validated his values and his 13 numbers, and I think he used incorrect assumptions and variables in his model."[31]

## IX.   MR. SPENCER CORRECTLY CONSIDERED ALL OF THE TESTIMONY.

Plaintiff argues that Mr. Spencer did not consider James Wagoner's use of Liquid Wrench at certain service stations reflected on his Social Security records. Plaintiff can only

---

[29] Exhibit A, Spencer Deposition, 35:13-36:9 and 72:1-73:7.
[30] Exhibit C, Spencer Report, p. 19.
[31] Exhibit A, Spencer Deposition, 43:9-14.

allege that the Social Security records appear to reflect that they are in fact service stations, but can not point to any evidence that James Wagoner actually used the product, Liquid Wrench, at any of these stations:  Henry Neely Dam Park, Direct Oil Co., and Soleman & Son Oil Co., Inc. Plaintiff attempts to reverse the burden of proof and engage in the assumption that James Wagoner "must have used Liquid Wrench" at each and every service station, regardless of whether it is supported in testimony.   There is simply no evidence that Mr. Wagoner used Liquid Wrench at any of these locations.

Plaintiff claims that Mr. Spencer excluded some of James Wagoner's service station work and hobby work time in his exposure assessment.  Mr. Spencer accounted for the time Mr. James Wagoner would have worked at the Phillips Garage and the Ragland Garage, *e.g.*, three and one-half years, which is the same number of years the Plaintiff's expert Dr. Kura claimed that James Wagoner worked, *e.g.*, three years at Phillips Garage.  Mr. Spencer even added an additional one-half year for his work at the Ragland garage which Dr. Kura did not include in his exposure calculation.

Plaintiff cites two locations as service stations, Direct Oil Co. and Soleman & Son Oil Co., where Mr. James Wagoner worked according to his social security records.  Plaintiff's motion states that Mr. Spencer "assumed that Direct Oil Co. and Soleman & Son Oil Co. Inc. were not gas stations or garages even though the Alabama Secretary of State records show that they were service stations."  This misstates his deposition testimony:

> Q. – Did you make any effort to determine whether or not that was a gas station [refers to Direct Oil Company, Inc.]?
> A. – No.  Again, I did not, because he did not make any claim of exposure to Liquid Wrench there.[32]
>
> Q.- Can you tell me whether or not you did any research to determine  if this was a gas station[refers to Soleman & Son Oil Co. Inc.]?

---

[32] Exhibit A, Spencer Deposition, 56:4-10.

A.- Again, the same scenario.  There was no claimed use of Liquid Wrench at this facility…[33]

Mr. Spencer did not include any exposure associated with that work since there is no evidence that James Wagoner used Liquid Wrench at these locations.  Even Dr. Kura did not include any exposure associated with James Wagoner's work at Direct Oil Co. and Soleman & Son Oil Co.

The statement in Plaintiff's motion that "Mr. Spencer admits he made an assumption regarding Henry Neeley Dam Park as a place of employment for Mr. Wagoner" misrepresents Mr. Spencer's testimony.  Mr. Spencer stated in his deposition testimony that this reference came from Wendell Wagoner's deposition testimony.  It is not an assumption on Mr. Spencer's part but based on testimony.  The reference in Mr. Spencer's report to Mr. Wagoner working at Neeley Dam Park in the summer of 1973 is from direct testimony of his brother, Mr. Wendell Wagoner.  Mr. Wendell Wagoner testified in the time period of 1972-76, there was a summer where James Wagoner had an "8 to 5 job" with the State clearing brush at the Neely Dam Park and swimming area.[34] After work he would work on cars. The next summer, James Wagoner was doing mechanic work all summer long for a period of time when he was 15 years old (~1974).[35]

Plaintiff stated in the Motion that "Mr. Spencer admitted that employment for short periods of time by Boyles Galvanizing Co. and Lillie Hoffman Cooling Towers for short in 1978 does not mean that Mr. Wagoner did not work on cars in the evening during this time frame." This is the same time frame, 1975 to 1978, that the Plaintiff's expert, Dr. Kura, assumed that

---

[33] Exhibit A, Spencer Deposition, 59:2-10.

[34] Exhibit H,  Wendell Wagoner Deposition, 53:21-54:6.

[35] Exhibit H, Wendell Wagoner Deposition, 54:11-14.

James Wagoner was working six days per week, eight-hours per day from at his home garage.[36] Dr. Kura's assumptions are clearly inconsistent with the social security records and are not consistent with the deposition testimony of Eric Wagoner who testified that he worked with James Wagoner starting in 1976 for three years at Phillips Garage.[37] Eric Wagoner's testimony stated that James Wagoner was going to high school when he worked at Phillips Garage and that James Wagoner worked after school and on weekends over that three-year period of time.[38] Mr. Spencer accounted for James Wagoner working after school during this time period in his exposure estimate, contrary to Plaintiff's allegations. Per Mr. Spencer's report, "Mr. James Wagoner was in high school in the 1975 to 1976/77 timeframe based on his completing the 11th grade in high school grade (Plaintiff's Answer to Defendant Radiator Specialty Company's Interrogatories, and Wendell deposition. 34:16-19)." Additionally, Wendell Wagoner testified that James Wagoner was playing football in the 9th and 10th grades.[39]

James Wagoner's Social Security records along with Mr. Wendell Wagoner's testimony[40] demonstrate that Mr. James Wagoner worked various other non-automotive type jobs during this same time period. For example, Wendell Wagoner testified that James Wagoner worked at a department store in Oxford in 1977 or 1978 stocking shelves after school.[41] Therefore is it unreasonable to assume Mr. James Wagoner was working full time as a mechanic at the same time he was attending high school, playing football, and working at department stores stocking shelves.

---

[36] Exhibit C, Spencer Report, p. 20, 2nd full ¶.
[37] Exhibit C, Spencer Report, p. 4, last ¶.
[38] Exhibit C, Spencer Report, p. 3; Eric Wagoner Deposition (10/11/10), 46:10-22; 106:3-6)
[39] Exhibit H, Wendell Wagoner Deposition, 17:3-9.
[40] Exhibit H, Wendell Wagoner Deposition, 89:8-90:1.
[41] Exhibit H, Wendell Wagoner Deposition, 89:17-90:1.

There is no testimony that supports the assumption that Mr. James Wagoner worked on vehicles or used Liquid Wrench while employed at Direct Oil Co. or Soleman & Son Oil Co. Additionally, Mr. Spencer's estimations of Liquid Wrench use at home was based on the testimony of Mr. Wagoner's two brothers of the amount of Liquid Wrench used.  The testimony did not provide the number of hours worked at the home garage so the hours used in the calculation were based upon the testimony the two brothers gave as to the average number of cans of Liquid Wrench used per week and the usage rate per hour.  Plaintiff suggests that Mr. James Wagoner may have worked on cars after his work at Boyles Galvanizing Co. and Lillie Hoffman Cooling Towers, but there is no testimony to support that he worked on cars after he came home from these jobs.   Additionally, Mr. Spencer calculated Mr. James Wagoner's inhalation dose over a 7.5-year exposure period from 1972 to 1978.

Plaintiff's comment about Mr. Spencer's criticism of the amount of Liquid Wrench used and the number of hours per day per use that Dr. Kura used to calculate Mr. Wagoner's exposure is again misleading to the Court.  On page 8, line 6 of the Motion, Plaintiff states:  ". . . Eric Wagoner testified that Jim Wagoner used 10 ounces of Liquid Wrench on a daily basis."  This is a misstatement of the evidence and improper use of the word "testified."  It is clear from Mr. Spencer's deposition that the alleged "10 ounces of Liquid Wrench on a daily basis" reported by Eric Wagoner came not from his deposition testimony but from Eric Wagoner's post-deposition sham affidavit which was prepared after a conference call among Dr. Kura, Eric Wagoner, and Plaintiff's counsel. Dr. Kura needed this post-deposition affidavit because he could not quantify Liquid Wrench exposure based on the sworn deposition testimony and could not have made his calculations or written his report based solely on the deposition testimony of Eric Wagoner and

Wendell Wagoner.[42]   This previously undisclosed, post-deposition "affidavit" contradicts Eric

Wagoner's deposition testimony, both on the amount of Liquid Wrench used on a daily basis and

on the use of fans and air conditioning.[43]   Further, Plaintiff's statement on page 8 of the

Memorandum that "Spencer further acknowledges that Wendell Wagoner testified that the

Ragland garage had poor ventilation, and the windows and doors were kept closed" again fails to

apprise the Court of Eric Wagoner's previous deposition testimony to the contrary.[44]

In Eric Wagoner's post deposition sham affidavit, which Mr. Spencer received after he

wrote his report, Eric Wagoner stated that James Wagoner used 10 ounces of Liquid Wrench per

day.   In his previous pre-deposition affidavit dated October 8, 2010, Eric Wagoner stated that

James Wagoner's work day was 8-10 hours per day.[45] A day is normally eight hours, so dividing

10 ounces by 8 results in approximately 1.2 ounces per hour.   The usage rate of 1.2 ounces per

hour is also supported by the testimony of Mr. Wendell Wagoner who estimated the usage of

Liquid Wrench was from one-half a can up to two or three 16-ounce cans per week between

1972 and 1976.[46] Taking the average of this range of values (28 ounces) and dividing it by the

hours worked per week (23 hours) equals 1.2 ounces/ hour, not the 3.3 ounces per hour assumed

by Plaintiff's expert, Dr. Kura.   Notably, the 3.3 ounces per hour used by the Dr. Kura is not

supported by the deposition testimony or affidavits provided by Eric Wagoner and Wendell

Wagoner.

Plaintiff claims that Mr. Spencer admitted that he erroneously assumed that Dr. Kura

used eight to nine hours per day for his exposure.   Mr. Spencer did not say this in his deposition.

The fact is Plaintiff's witnesses state in their affidavits that James Wagoner worked eight hours

---

[42] Exhibit G, Kura Deposition, 354:19-356:3, 359:20-362:2.
[43] Exhibit A, Spencer Deposition, 65:3-17.
[44] Exhibit H, Wendell Wagoner Deposition, pp. 54, 34, 17, 89.
[45] Exhibit J, Eric Wagoner Affidavit dated 8/8/2010.
[46] Exhibit H, Wendell Wagoner Deposition, 37:18-38:4.

per day, and Dr. Kura based part of his calculations of James Wagoner's exposure to Liquid Wrench on eight hours per day.[47]  Mr. Spencer stated accurately what Dr. Kura's assumptions were in his report.

## X.    MR. SPENCER REBUTTED THE DERMAL FLUX MODEL APPROACH THAT HAS NEVER BEEN VALIDATED.

Plaintiff, again, partially quotes Mr. Spencer out of context when Plaintiff states in the Memorandum that "I used the same criteria or the same approach—the same modeling approach—for dermal and the airborne concentrations as your expert did in this case, although I changed the percent benzene, I changed the near-field volume, I changed the—surface area that was contact." Mr. Spencer performed the same procedure as Dr. Kura as a rebuttal to this misuse of a test that was subsequently invalidated.[48]  Mr. Spencer based his calculations and assumptions on the actual evidence in this case to rebut Dr. Kura's faulty assumptions and calculations. Mr. Spencer never admitted that Dr. Kura used a valid method to determine dermal exposure calculation.[49]

Addressing Plaintiff's comment about a Dermal Flux Model, Section VI (validity of the dermal flux model used to calculate Mr. Wagoner's dermal exposures from using Liquid Wrench and Varsol), the dermal flux model has not been validated for occupational benzene exposures. Even if dermal flux exposure estimation models had been validated, Dr. Kura's development of an equation to predict flux values for mixtures containing variable volumes of benzene has not been validated, has no known error rate, and is therefore unreliable.[50] This approach does not address the differences in exposures based on personal factors (individual differences) nor does it

---

[47] Exhibit I, Dr. Kura's Report, p. 27.

[48] Exhibit C, Spencer Report, pp. 27-31.

[49] Exhibit A, Spencer Deposition, 126:4-9.

[50] Exhibit C, Spencer Report, p. 10 (1)(2).

address factors associated with the exposure environment (environmental factors such as temperature, airflow across the skin surface, etc.).[51]

Most significantly, Dr. Kura's equation does not reflect the differences in flux based on the solvent (product) vehicle or combination of other chemicals in the mixture, especially as it effects permeation and evaporation rates.[52]

Dr. Kura used dermal flux data published by Hanke, *et al*. (1961). Contrary to the products at issue in this case (Liquid Wrench and Varsol), Hanke, *et al*. (1961) evaluated the flux of pure (neat) benzene.[53] In a recent article regarding dermal absorption of benzene (Williams, *et al*. 2011) the authors concluded:

> *Because relatively few dermal absorption studies have been conducted on benzene-containing organic solvents and it is unclear whether or to what extent differences in study design, test method, or liquid vehicle may influence the test results, it is not possible to determine a reliable range of benzene dermal flux values for the general category of organic solvent mixtures at this time.*

As noted in the Plaintiff's Memorandum, Spencer has used dermal modeling in other cases.  Spencer stated:

> *Q.      Okay.  And have you used a dermal calculation in other cases?*
> *A.      I've done it in other litigation cases only where I was basically asked to evaluate what a plaintiff's expert has done and to demonstrate that - - the variations in values by changing very basic parameters to the model, and, therefore, demonstrating the unreliability of that model.[54]*

While a dermal calculation was included in the Spencer Affidavit in the Nawrocki matter, Mr. Spencer clearly noted that:

> *Air monitoring for determination of employee exposure is presently the only method accepted by the Occupational Safety and health Administration (OSHA for evaluating compliance with occupational standards.[55]*

---

[51] Exhibit C, Spencer Report, p. 23, ¶ 2.
[52] Exhibit C, Spencer Report, p. 23, ¶ 2.
[53] Exhibit C, Spencer Report, p. 23.
[54] Exhibit A, Spencer Deposition, 14:2-9.
[55] Exhibit G to Plaintiff's Memorandum, p. 7.

Dermal modeling applied for purposes of calculating exposure dose is not a standardized or accepted industrial hygiene method for evaluating an individual's exposures to volatile mixtures such as toluene, mineral spirits, or benzene for comparison with established occupational health standards.  According to OSHA in the 1987 Preamble to the Benzene Standard, the degree of uncertainty associated with these models varies widely depending on the input values used to estimate the flux (the rate at which a substance is absorbed through skin).

When developing the occupational health standards and guidelines for benzene and benzene-containing mixtures such gasoline, the Occupational Safety and Health Administration (OSHA) and other standard and guideline setting agencies discussed the dermal route of exposure and recommended efforts to minimize skin exposures. However, each relevant agency, administration, and organization has relied on air monitoring (the inhalation route of exposure) to evaluate workplace and non-occupational environments and in some cases, has required medical monitoring as the surrogate for evaluating total exposure dose resulting from both dermal and inhalation exposures to benzene or benzene-containing products. If, as in the case study presented by Williams and Paustenbach (2003), researchers were to include a dermal assessment in calculating total benzene exposure, then it would be necessary to recalculate the cancer potency factor and/or new occupational health standards for benzene.

OSHA considered dermal routes of exposure in the development of the benzene standard. After addressing dermal exposures in the development of occupational exposure limits for benzene, OSHA set an airborne exposure limit. Rather than add the results of dermal exposure models to measured airborne exposures (acquired through validated, standardized methods), OSHA relied upon airborne concentrations derived from epidemiological studies in order to

evaluate workplace exposures to benzene and benzene-containing solvents (Williams, *et al.* 2011).

There **is no dermal exposure limit**. A separate dose calculation was not added to the inhalation dose when developing the occupational health standards; *i.e.,* OSHA Permissible Exposure Limit (PEL), American Conference of Governmental Industrial Hygienists Threshold Limit Values (ACGIH TLV®), and the National Institute for Occupational Safety and Health Recommended Exposure Limits (NIOSH REL).  In fact, Mr. Spencer has reviewed hundreds of NIOSH Health Hazard Evaluation (HHE) reports and OSHA inspection reports as they relate to the assessment of worker exposure to benzene and not a single one quantified dermal dose or used dermal dose as a component of measuring employees' exposures to benzene.  OSHA, ACGIH, and NIOSH neither require nor recommend quantifying dermal exposures in specific health standards (Williams, et al. 2011).[56]

Mr. Spencer has properly relied on all the relevant evidence, testimony, and documents to draw the following conclusion as outlined in his May 3, 2011 report:

> Dr. Kura used an invalidated dermal flux model to calculate Mr. Wagoner's dermal exposures from using Liquid Wrench.  Dermal modeling applied for purposes of calculating occupational exposure dose is not a validated, standardized or accepted industrial hygiene method for evaluating an individual's exposures to volatile mixtures for comparison to occupational exposure limits. Importantly, Dr. Kura's dermal exposure methodology for calculating dermal exposures to benzene from mixtures containing variable volumes of benzene has not been validated and therefore, his dermal exposure calculations are neither relevant nor reliable.  There is no occupational health standard based on the dermal modeling method.[57]

---

[56] Exhibit C, Spencer Report, p. 2, and Exhibit B, Spencer CV, p. 10.
[57] Exhibit C, Spencer Report, p. 2.

## XI.     MR. SPENCER CORRECTLY CITES DOCUMENTED EVIDENCE OF PALM SURFACE.

On page 9 through the top of page 10 of Plaintiff's Memorandum, Plaintiff presents the Court with another misstatement:  "[f]inally, Spencer opined in his report that Dr. Kura used the wrong surface area for calculating the dermal calculation of the palms but when questioned in his deposition he admitted that the Liquid Wrench would get on both of his hands when used."  This is a creative misconstruing of the testimony.   As Mr. Spencer correctly stated, "Dr. Kura assumed the surface area of the palms to be 500cm$^2$.  Kodak anthropometric data table indicates that the mean surface area for both palms on men to be 200cm$^2$.  Dr. Kura's estimate is more than double what the surface area is for the palms."[58]   Further, in deposition, what Mr. Spencer actually said was:

Q:     **Did Eric Wagoner testify** that the Liquid Wrench would get on both hands while they were using it?

A:     Yes. [59]

## XII.    MR. SPENCER ADDRESSED MATERIAL SAFETY DATA SHEETS AND REGULATIONS REGARDING VARSOL.

While this will be addressed in detail by Defendant, Exxon Mobil, in Plaintiff's Memorandum, Section VII, pages 10 and 11, Plaintiff's comment that "Mr. Spencer alleges occupational exposures to mineral spirits are not associated with multiple myeloma" is a misstatement of the context of the discussion addressed in that section.   Mr. Spencer, in discussing the OSHA Final Benzene Standard, was addressing an employer's responsibility under OSHA and the standard for a material safety data sheet content.[60]  Plaintiff's comment that Mr. Spencer ignored sections of OSHA documents is totally unsupported by the record.

---

[58] Exhibit C, Spencer Report, p. 24, last paragraph.
[59] Exhibit A, Spencer Deposition, 81:3-6.
[60] Exhibit A, Spencer Deposition 81:7-84:9.

Regardless, Mr. Spencer has been wrongly accused of going outside of his area of expertise, and this accusation is not supported by Mr. Spencer's deposition testimony.

## XIII.  NO EXPOSURE ASSESSMENT DONE BY KOPSTEIN.

While these matters will be fully addressed by Exxon, Section VIII of Plaintiff's Memorandum, pertaining to "Kopstein's 12.4 ppm value for benzene exposure while using Varsol is valid peer-reviewed data," the associated criticism of John Spencer is baseless due to a lack of understanding of Mr. Spencer's comments.  Dr. Kopstein did not do an exposure assessment for James Wagoner.[61]  However, it is noteworthy that Plaintiff again presents the Court with an inaccurate quotation.  Plaintiff states that Mr. Spencer "has no experience in partial evaporation and benzene emissions of a product."  The accurate testimony is:

> Q:      Are you an expert in the field of determining partial evaporation and emissions of benzene when partial evaporation occurs?
>
> A:      I—I have—we have conducted an extensive study of that, so I probably have more information than—most people in that regard.
>
> Q:      But do you consider yourself an expert in that field?
>
> A:      Again, it's part of what I do as an industrial hygienist.  I'm not here as an evaporation scientist.[62]

## XIV.  MR. SPENCER'S TESTIMONY AND REPORT DOES NOT DEVIATE FROM HIS EXPERTISE.

In addressing Section X of Plaintiff's Memorandum, Plaintiff states Varsol and Liquid Wrench were defective and unreasonably dangerous.  This is an inappropriate request for the Court to limit alleged testimony not contained in Mr. Spencer's report or deposition. Mr. Spencer has addressed exposure calculations, validation, modeling, time-weighted average, proper industrial hygiene procedure, and has expressed the opinion that Mr. Wagoner's use of Liquid

---

[61] Exhibit A, Spencer Deposition 44:11-15.
[62] Exhibit A, Spencer Deposition, 135:8-18

Wrench formula in the 1970s was within the appropriate exposure limits.[63]  Mr. Spencer is well qualified to express his opinions set forth in his report.

## XV.    CONCLUSION.

Mr. Spencer's opinions are annotated and based upon scientifically reliable methodology. Mr. Spencer considered only validated tests, and did not consider outlier and discredited tests. Mr. Spencer based his calculations and opinions upon the actual deposition testimony in the case, without engaging in post deposition affidavits, unsupported by evidence.   Mr. Spencer demonstrated in his report and testimony that he has considered all reliable and relevant data and, in fact, even addressed the data which was not validated and testing procedures which have not been validated, and explained his reasons for such opinions.   For these reasons, Plaintiff's Motion to Exclude Testimony of Defendants' Industrial Hygienist, John Spencer should be denied.

Respectfully submitted:

/s/ *Lynn Luker*
Lynn Luker (#8935)
**Lynn Luker & Associates, LLC**
3433 Magazine Street
New Orleans, LA  70115
Phone:  (504) 648-6000
Fax:     (504) 525-5599
Lynn.Luker@LLALaw.com

James M. Riley, Jr. (TX Bar No. 16931800)
**Coats Rose Yale Ryman & Lee, PC**
3 E. Greenway Plaza, Suite 2000
Houston, TX  77046
Phone: (713) 653-7375
Fax:     (713) 651-0220
JRiley@coatsrose.com

**Attorneys for Defendant,**
**Radiator Specialty Company**

---

[63] Exhibit C, Spencer Report,  p. 29, 31.

**CERTIFICATE OF SERVICE**

    I hereby certify that on the 26th of July, 2011, a copy of the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing was sent to all counsel of record via the Court's electronic notification system.

                        /s/ *Lynn Luker*