UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **MACIE J. WAGONER, ET AL.** | **CIVIL ACTION NO. 09-7257** |
| VS. | SECTION: "L" |
| **EXXONMOBIL CORP., ET AL** | JUDGE FALLON<br>MAGISTRATE: KNOWLES (3) |

**DEFENDANT EXXON MOBIL CORPORATION'S OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE TESTIMONY OF DEFENDANT'S INDUSTRIAL HYGIENIST, JOHN SPENCER, SPECIFICALLY WITH REGARD TO EXXON'S VARSOL**

COMES NOW Exxon Mobil Corporation ("ExxonMobil"), and respectfully submits its Opposition to Plaintiff's Motion to Exclude Testimony of Defendant's Industrial Hygienist, John Spencer, Specifically with Regard to Exxon's Varsol. Fundamentally, the role of a defense expert is to confront the opinions of the corresponding plaintiff expert. This is just what John Spencer, defendant's industrial hygienist, has done. Plaintiff does not offer any testimony from an industrial hygienist, but an "environmental engineer" who has estimated a dose for Mr. Wagoner. Plaintiff's motion to strike Spencer is not a *Daubert* motion at all, but a misleading refutation of Spencer's opinion. Plaintiff is welcome to confront the witness with these challenges at trial, through cross examination, but the motion to strike should be denied.

Plaintiff's attack on Mr. Spencer with regard to his opinions concerning Exxon's Varsol product are set forth in Sections VI, VII, VIII, IX and X of her memorandum. None of these attacks merits exclusion or even addresses *Daubert* factors; plaintiff merely disagrees with the witness.

Plaintiff's approach seems to be to take a statement by Mr. Spencer out of context and then use that statement to conclude "John Spencer denies relevant evidence, testimony and documents in this case to arrive at unreliable and flawed opinions." To the contrary, as the Court will see it is plaintiff who ignores all of the other testimony of the witnesses on the same issue, who ignores all of the other relevant evidence on the same issue, and ignores all of the other documents on the same issue that makes plaintiff's conclusions erroneous.

The following response to the sections of Plaintiff's brief that address Mr. Spencer's opinions as they relate to Varsol will show that Plaintiff's conclusions are basically contrary to Mr. Spencer's testimony.

**Section VI    Validity of the Dermal Flux Model used to Calculate Mr. Wagoner's Dermal Exposures from Using Liquid Wrench and Varsol**

As Spencer testified, the dermal flux (the rate at which a substance is absorbed through skin)[7] model has not been validated for occupational benzene exposures. Even if dermal flux estimation models had been validated, Dr. Kura's development of an equation to predict flux values for mixtures containing variable volumes of benzene has not been validated, has no known error rate and is therefore unreliable.

In a recent article regarding dermal absorption of benzene (Williams, et al. 2011) the authors concluded:

> *Because relatively few dermal absorption studies have been conducted on benzene-containing organic solvents and it is unclear whether or to what extent differences in study design, test method, or liquid vehicle may influence the test*

> *results, it is not possible to determine a reliable range of benzene dermal flux values for the general category of organic solvent mixtures at this time.*[18]

As noted in the Plaintiff's memorandum, Spencer has used dermal modeling in other cases. Spencer stated (page 39):

> Q. Okay. And have you used a dermal calculation in other cases?
> A. I've done it in other litigation cases only where I was basically asked to evaluate what a plaintiff's expert has done and to demonstrate that - - the variations in values by changing very basic parameters to the model, and, therefore, demonstrating the unreliability of that model.[4]

While a dermal calculation was included in the Spencer Affidavit in the Nawrocki matter (Plaintiff Exhibit G), Spencer clearly noted that "*Air monitoring for determination of employee exposure is presently the only method accepted by the Occupational Safety and health Administration (OSHA for evaluating compliance with occupational standards.*"[16] Plaintiff is welcome to cross examine the witness with this affidavit, but it is no basis to exclude testimony.

When developing the occupational health standards and guidelines for benzene and benzene-containing mixtures such as gasoline, the Occupational Safety and Health Administration (OSHA) and other standard and guideline setting agencies discussed the dermal route of exposure and recommended efforts to minimize skin exposures. However, each relevant agency, administration, and organization has relied on air monitoring (the inhalation route of exposure) to evaluate workplace and non-occupational environments. If plaintiff disagrees with Mr. Spencer's analysis and these governmental agencies, so be it. That is what cross examination is for. *See Burton v. Wyeth-Ayerst Labs. Div. of Am. Home Prods. Corp.*, 513 F. Supp. 2d 719, 725-26 (N.D. Tex. 2007) ("At no point does Wyeth challenge the validity of the studies . . . relied on by Miller. Instead, Wyeth attempts to attack Miller's conclusion, not methodology, by offering competing studies . . . While Wyeth presents the court with some studies and abstracts that provide an arguable basis to question Miller's opinion, these studies and

abstracts do not make Miller's opinion inadmissible."); *Keys v. M/V Ming Longevity*, No. 01-2447, 2003 WL 25720981, at *2 (E.D. La. Jan. 21, 2003) (noting that, although one expert's testimony may conflict with another expert's testimony, the party opposing the expert's testimony should establish deficiencies in that testimony through cross-examination, not exclusion). But none of plaintiff's criticisms merit exclusion; Spencer's methodology and opinions are sound and well represented both by report and deposition.

OSHA considered dermal routes of exposure in the development of the Benzene standard. After addressing dermal exposures in the development of occupational exposure limits for benzene, OSHA set an airborne exposure limit. OSHA relied upon airborne concentrations derived from epidemiological studies in order to evaluate workplace exposures to benzene and benzene-containing solvents (Williams, et al. 2011).[18]

Mr. Spencer's opinions are based on an appropriate scientific methodology. Mr. Spencer has properly evaluated the plaintiff's dose estimate, relied on the relevant evidence, testimony, and documents to draw the following conclusion as outlined in his 3 May 2011 report:

- Dr. Kura proposed the use of a dermal flux model to calculate Mr. Wagoner's dermal exposures from using Varsol to remove pipe dope from oilfield pipe. Dermal modeling applied for purposes of calculating exposure dose is not a standardized or accepted industrial hygiene method for evaluating an individual's exposures to volatile mixtures. Additionally, Dr. Kura's dermal exposures methodology for calculating dermal exposures to benzene from mixtures containing variable volumes of benzene has not been validated and therefore, his dermal exposure calculations are neither relevant nor reliable.[15]

**Section VII   Mr. Spencer's Testimony Regarding Multiple Myeloma**

The philosophy of industrial hygienists is the protection of the health and well-being of workers and the public through the anticipation, recognition, evaluation, and control of hazards arising in or from the workplace (DiNardi 1997).[5] Industrial hygienists, such as Mr. Spencer, have knowledge and training in the fields of chemistry, biology, toxicology, epidemiology, and

721209.1

4

engineering, and physics. Consequently, when performing their work, industrial hygienists must rely upon the scientific literature. As Spencer said in his 3 May 2011 report regarding Varsol:

> The primary product at issue in this matter was mineral spirits, not benzene. Mineral spirits, also known as Stoddard solvent is a mixture of 48% straight and branched chain paraffins (C9 to C12), 38% naphthenes (cycloparaffins), and 14% aromatic hydrocarbons (ACGIH 2001). It is a colorless liquid with a kerosene-like odor. According to the AIHA, "*millions of industrial and domestic workers have been exposed to Stoddard solvent with minimal evidence of serious health effects, apart from it defatting and irritating action on the skin.*" Consequently, relevant industrial hygiene references cited no association between mineral spirits (Stoddard solvents) and multiple myeloma (ACGIH 2001; ATSDR 1995; NIOSH 2005; IARC 1989).[1, 2, 10, 11, 15]

In his report, Mr. Spencer is not providing his own medical opinion. He simply reported the findings from "*relevant industrial hygiene references.*" None of these references cited an association between mineral spirits and multiple myeloma.

In their Memorandum, the Plaintiff has quoted a statement from the Preamble to OSHA's benzene standard regarding the potential for benzene to cause multiple myeloma. The Plaintiff is misleading in the use of the quote in that it has nothing to do with mineral spirits. Nowhere in the Preamble to OSHA's benzene standard does it state that mineral spirits can cause multiple myeloma.

**Section VIII   Regarding Kopstein's estimate of benzene exposure**

Plaintiff again argues that Mr. Spencer should be excluded simply because he reaches a conclusion that is different from plaintiff's experts. As ExxonMobil explained earlier, this is simply a possible area for cross-examination, but in no way is grounds for exclusion.

Further, contrary to the Plaintiff's allegations, Mr. Spencer acknowledges that the 12.4 ppm benzene concentration used by Dr. Kura in his 20 March 2011 report was also the value included in Dr. Kopstein's 17 February 2001 report and included in his published article

(Deposition of John Spencer, page 47).[4, 12, 13]  What Mr. Spencer took issue with was that Dr. Kura incorrectly attempted to apply that concentration to Mr. Wagoner.

> *"Well, that number 12.4 is in this published article, and it's the same number that's in his report.  It still has nothing to do with Mr. Wagoner's exposure."*[4]

Spencer Depo. At 47.

In reality it was the Plaintiff's experts that relied upon unproven and invalidated methodologies to predict Mr. Wagoner's potential benzene exposures from Varsol.  As a matter of fact, Dr. Kopstein provided no estimate of Mr. Wagoner's exposure to benzene from the use of Varsol while cleaning oilfield pipes at Magnaflux.  Dr. Kopstein was asked about this issue in his deposition (page 45):

> Q.  Now, you have not done an exposure assessment in this case with regard to Mr. Wagoner?
> A.  I have not.[3]

Instead, in his report Dr. Kopstein opined that *if* someone was working with mineral spirits that contained 0.1% (1,000 ppm) benzene and *if* the airborne concentration of total hydrocarbons was 100 ppm, then the benzene concentration within the 100 ppm would comprise 12.4 ppm.[13]  Dr. Kopstein stated that his estimate was based on calculations that he made and that neither he nor anyone else has conducted actual air sampling to confirm such a relationship (Deposition of Melvin Kopstein, page 44).[3]  Dr. Kopstein has not validated his theoretical method and failed to utilize the available published studies summarizing such exposures.  Spencer is simply confronting and evaluating this unsupported theory.

Consequently, Dr. Kura relied on Dr. Kopstein's 12.4 ppm benzene concentration, which Dr. Kopstein admitted was not based on Mr. Wagoner's work tasks or conditions.  No independent inhalation exposure estimate was made by Dr. Kura.  As previously stated, Dr. Kopstein never performed an assessment of Mr. Wagoner's exposure as a result of the use of

a solvent to clean oilfield pipes. The 12.4 ppm benzene concentration contained in Dr. Kopstein's report was not related in any manner to Mr. Wagoner's work at Magnaflux. He did not take into account the frequency and duration of product use to properly convert Mr. Wagoner's theoretical benzene exposure to an 8-hour time weighted value. Dr. Kura's reliance on that concentration renders his opinion neither relevant nor reliable, and Spencer so testified.

Mr. Spencer has properly relied on all the relevant evidence and peer reviewed data to draw the following conclusions as outlined in his 3 May 2011 report:

- There is no air sampling data for Mr. Wagoner during his tenure at Magnaflux. However, based on the information contained in the OSHA benzene standard and the Williams, et al. (2008) study it is clear that overall benzene exposures associated with the use of products containing 0.1% benzene were well below the OSHA benzene action level of 0.5 ppm as an 8-hour time weighted average. Additionally, the Southwest Research Institute study showed that Varsol emissions were well below the OSHA action level of 0.5 ppm as an 8-hour time weighted average. Consequently, Mr. Wagoner's potential exposure to benzene from Varsol, if he used any at all, would have been a fraction of that concentration and his cumulative benzene exposure when working at Magnaflux would have been less than 1 ppm-year.[15]

- The Plaintiff has listed Melvin Kopstein as their expert chemical engineer. Dr. Kopstein has not provided any estimate of Mr. Wagoner's exposure to benzene from the use of Varsol while cleaning oilfield pipes at Magnaflux.[15]

- The Plaintiff has listed Bhaskar Kura as their expert environmental engineer. Dr. Kura opined that Mr. Wagoner was exposed to 12.4 ppm benzene via inhalation and his cumulative inhalation exposure was 24.8 ppm-years. Dr. Kura cited Dr. Kopstein as the source for that value and made no independent estimate of Mr. Wagoner's inhalation exposure. The 12.4 ppm benzene concentration contained in Dr. Kopstein's report was not correlated to Mr. Wagoner's work at Magnaflux. Consequently, Dr. Kura's reliance on that concentration renders his opinion neither relevant nor reliable.[15]

Undoubtedly, Plaintiff dislikes these conclusions but has provided the Court no basis to exclude them.

721209.1

**Section IX     Warning Label and Material Safety Data Sheet**

It is again unclear why Plaintiff believes that Spencer, inarguably qualified in the area of industrial hygiene, should be excluded. Plaintiff continues to confuse benzene with mineral spirits and seeks to impose the labeling requirements for benzene on mineral spirits, such as Varsol.[1] Furthermore, they accuse Mr. Spencer of ignoring Varsol test results to conclude that Varsol's benzene content was less than 100 ppm.

In fact, Mr. Spencer stated that the class of mineral spirits are different from benzene and that you would not have to include the same warning for mineral spirits as you would for benzene.

Mr. Spencer was questioned about the 1958 and 1964 Esso Toxigrams for **Benzene**:

> Q. Okay. Can you tell me if there are warnings for the dangers of benzene such as the ones included in the Esso Toxigram from '58 or '64 on that Material Safety Data Sheet?
> A. I don't see that, but his is - - it's class- - - this is mineral spirits. Mineral spirits is tested as a mixture, and you would not have to include the warnings for benzene.[4]

Spencer Depo. at 105.

Further, the federal regulations related to warnings are consistent with Mr. Spencer's opinion. The Hazard Communication Standard does not require manufacturers or importers of a product to include carcinogenic constituents on its MSDS if the product contains less than 0.1% of a carcinogen or if it is not likely to be released into the workplace at concentrations that would exceed OSHA's permissible exposure limit or present a health hazard at those concentrations.[8] Based on OSHA's rulemaking, benzene contained in a product at concentrations of less than

---

[1]     To illustrate the significance of this distinction, a hypothetical solvent containing 100 ppm of benzene contains only one one-hundredth of one percent benzene (0.01%). For every part of benzene, this solvent would contain 9,999 parts of something else. To put it simply, "benzene" and "mineral spirits" are not interchangeable, and Spencer has correctly focused on the relevant product —not benzene.

0.1% would "*give a high degree of confidence*" that resulting airborne concentrations would be below the action level.[7]  Therefore, products containing less than 0.1% benzene would not need to include benzene as an ingredient of the product.

The purpose of the OSHA Benzene Standard was to establish uniform requirements for worker health and safety as it applies to the use of benzene containing products.  The Benzene Standard specifically excluded *"...work operations where the only exposure to benzene is from liquid mixtures containing 0.1 percent [1,000 ppm] or less of benzene by volume or the vapors released from such liquids..."*[7]  Therefore, as Mr. Spencer explained in his report, the Benzene Standard would not apply to Varsol.

In his 3 May 2011 report, Mr. Spencer discussed the 1980 Varsol study conducted by Exxon:

> Southwest Research Institute (SWI 1980) performed a field study to evaluate emissions of benzene from Varsol.  Eight-hour TWA concentrations were evaluated at several distances downwind from an open container of Varsol situated in an open field.  Ten gallons of Varsol was placed in a 12 gallon stainless steel container measuring 28 inches by 14 inches.  Two tests were conducted.  The first evaluated concentrations under ambient conditions and during the second test the Varsol was heated to 100°F to simulate summer conditions.  During the first test benzene concentrations at two to four feet downwind ranged from 0.0043 ppm to 0.0209 ppm and during the second test benzene concentrations at three to six feet downwind ranged from 0.05 ppm to 0.19 ppm.[14, 15]

Mr. Spencer was questioned about the study and the samples collected six inches from a heated vat of Varsol (Page 100):

> Q. *So, is it your opinion when - - when - - when you do a study like this and you go back and try to simulate or modify, like, heating the product to get to the temperature for a summer day, that that's and invalid study?*
> A. *No, no, no.  What I'm saying is - - and any good industrial hygienist who has experience can explain this to you - - these are area samples, and they're six inches away, they're fixed in place.  They're not representative of a personal exposure of someone working with this.  If you look at the rest of the data, as soon as you get a foot or two away, it goes down to,*

9

> *you know, a fraction of that value and mostly nondetect. If you go slightly upwind of that value it's nondetect. So, the numbers that you're referring to are not representative of an individual's exposure.*[4]

One 1976 document (EXMWAG000046) reported the benzene content of Varsol was 800 ppm (0.08%), which was well below the 0.1% OSHA exclusion.[6] This report was inconsistent with all the other Varsol benzene concentrations, and could be considered an outlier. Mr. Spencer has reviewed many documents that consistently showed that the benzene content of Varsol was well below 100 ppm. As noted in Mr. Spencer's 3 May 2011 report:

> Prior to Mr. Wagoner's work at Magnaflux, Exxon evaluated the benzene content of Varsol 1, 3, and 18. In 1976 the reported that the benzene content of Varsol was <0.01% (<100 ppm) (EXMWAG000045), in 1978 the benzene content of Varsol 1, 3, and 18 was 24 ppm, 17 ppm, and 26 ppm, respectively (EXMWAG000064), in 1979 the benzene content Varsol 1, 3, and 18 was 17.4 ppm, 12.1 ppm, and 15.1 ppm, respectively (EXMWAG000075), in 1981 the Varsol 1, 3, and 18 was 5.2 ppm, 17.2 ppm, and 12.9 ppm, respectively (EXMWAG000076). It is clear from the solvent data provided that the benzene concentrations in Varsol were well below regulatory levels considered to have been significant and thus were *de minimis*.[6, 15]

It is clear that overall, the chemical characterization of the mineral spirits that Mr. Wagoner allegedly used indicated the presence of benzene at concentrations well below the 0.1% OSHA exclusion. Therefore, based on OSHA's analysis, resulting airborne concentrations would have been well below OSHA's action level of 0.5 ppm. Consequently, as noted in Spencer's 3 May 2011 report:

> Mr. Wagoner's use of Varsol and the available Varsol labels and MSDS predated OSHA's Hazard Communication Standard. However, the Varsol labels and MSDS were more than sufficient to convey the necessary information to Mr. Wagoner's employers in order for them to develop the necessary safety and health programs protective of his health.[15]

## CONCLUSION

John Spencer is the only certified industrial hygienist retained in this case. He has painstakingly evaluated plaintiff's erroneous dose estimates and faulty assumptions regarding

any alleged benzene exposure.  His qualifications, methodology, and opinions are fully disclosed, reliable, sound, and generally accepted in the relevant field.  His opinions are based on a reliable foundation, including the references listed below.  In spite of having no certified industrial hygienist, plaintiff presumes to challenge Spencer as unreliable, but in fact seems simply to disagree with his conclusions.  Plaintiff may cross-examine Mr. Spencer on topics where she disagrees with his conclusions, but none of those disputes in any way warrants Mr. Spencer's exclusion.  The motion to strike therefore should be denied.

**References:**

1. American Conference of Governmental Industrial Hygienists (ACGIH).  2001.  *Documentation of the Threshold Limit Value and Biological Exposure Indices*.  Cincinnati, Ohio: ACGIH.

2. Agency for Toxic Substances and Disease Registry (ATSDR).  1995.  *Toxicological Profile for Stoddard Solvent*.

3. Deposition of Melvyn Kopstein, taken 13 April 2011.

4. Deposition of John Spencer, taken 22 June 2011.

5. DiNardi, S.R.  1997.  *The Occupational Environment – Its Evaluation and Control*.  AIHA Press.

6. ExxonMobil Production (EXMWAG000001-EXMWAG000178).

7. Federal Register.  34460-34578. Department of Labor, Occupational Safety and Health Administration.  29 CFR Part 1910.  Occupational Exposure to Benzene; Final Rule.  11 September 1987.

8. Federal Register.  53280-53348. Department of Labor, Occupational Safety and Health Administration.  Hazard Communication; Final Rule.  25 November 1983.

9. Hanke, J., T. Dutkiewicz, and J. Piotrowski.  1961. "The Absorption of Benzene through the Skin in Man." *Med. Pracy*, 12: 413-426. OSHA 2000 translation and reprint in: *International Journal of Occupational and Environmental Health*. 6:104-111.

10. International Agency for the Research on Cancer (IARC).  1989.  *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, Some Organic Solvents, Resins*

*Monomers, and Related Compounds, Pigments, and Occupational Exposures in Paint Manufacture and Painting*.  Volume 47.

11. National Institute for Occupational Safety and Health (NIOSH).  2005.  *NIOSH Pocket Guide to Chemical Hazards*.

12. Report by Bhaskar Kura, Ph.D., P.E., dated 20 March 2011.

13. Report by Melvyn Kopstein, Ph.D., dated 17 February 2011.

14. Southwest Research Institute (SWI).  1980.  *Field Study to Determine Emissions of Benzene from Varsol*.

15. Spencer, John W.   Summary Report dated 3 May 2011 re: Macie Wagoner, et al. v. Exxon Mobil Corp., et al.

16. Spencer, John W. Affidavit dated 28 September 2005 re: Nawrocki matter.

17. Williams, P.R.D. and Paustenbach, D.J.  2003.  "Reconstruction of Benzene Exposure for the Pliofilm Cohort (1936-1976) Using Monte Carlo Techniques."  *Journal of Toxicology and Environmental Health, Part A*.  66:677-781.

18. Williams, P.R.D., Sahmel, J., Knutsen, J., Spencer, J., Bunge, A.L.  2011.  "Dermal Absorption of Benzene in Occupational Settings:  Estimating Flux and Applications for Risk Assessment."  *Critical Reviews in Toxicology*.  41:111-142.

       Respectfully submitted,

       KEAN MILLER HAWTHORNE
       D'ARMOND MCCOWAN & JARMAN LLP

       By:  /s/ Carol L. Galloway
          Gary A. Bezet
          Bar No. 21794
          Gregory M. Anding
          Bar No. 23622
          Carol L. Galloway
          Bar No. 16930
          II City Plaza
          400 Convention St., Suite 700
          Baton Rouge, Louisiana  70825
          (225) 387-0999
          (225) 388-9133 (FAX)
          gary.bezet@keanmiller.com

        BAKER BOTTS L.L.P.

By  /s/ Tynan Buthod
     Tynan Buthod
     Tx  State Bar No. 03513500
     3000 One Shell Plaza
     910 Louisiana
     Houston, Texas  77002
     (713) 229-1234
     (713) 229-1522 (FAX)
     ty.buthod@bakerbotts.com

and

WOOLF MCCLANE BRIGHT ALLEN & CARPENTER PLLC
     Louis C. Woolf
     Denise Moretz
     P.O. Box 900
     Knoxville, Tennessee  37901

ATTORNEYS FOR EXXON MOBIL CORPORATION

## CERTIFICATE OF SERVICE

I hereby certify that on July 26, 2011, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all parties of record which are CM/ECF participants by operation of the Court's electronic filing system.

/s/ Carol L. Galloway
Carol L. Galloway