**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **JAMES WAGONER, JR. ET AL.** | * | **CIVIL ACTION** |
| | * | |
| **VERSUS** | * | **NO. 09-7257** |
| | * | |
| **EXXON MOBIL CORPORATION ET AL.** | * | **SECTION "L" (3)** |

**ORDER & REASONS**

Before the Court are twelve motions: (1) a Motion for Summary Judgment (Rec. Doc.

No. 145) filed by Defendant Radiator Specialty Company ("Radiator"); (2) a Motion for Partial

Summary Judgment (Rec. Doc. No. 139) filed by Plaintiff Macie Wagoner; (3) a Motion for

Summary Judgment (Rec. Doc. No. 154) filed by Defendant Exxon Mobil Corporation

("ExxonMobil"); (4) a Motion to Exclude Dr. Sheila Butler and Dr. Jack Saux and for Summary

Judgment (Rec. Doc. No. 147) filed by Radiator; (5) a Motion to Exclude Dr. Butler and Dr.

Saux and for Summary Judgment (Rec. Doc. No. 156) filed by ExxonMobil; (6) a Motion to

Strike the Affidavit of Eric Wagoner, to Exclude Dr. Bhaskar Kura, and for Summary Judgment

(Rec. Doc. No. 149) filed by Radiator; (7) a Motion to Exclude Dr. Kura and for Summary

Judgment (Rec. Doc. No. 151) filed by ExxonMobil; (8) a Motion to Exclude Dr. Melvyn

Kopstein (Rec. Doc. No. 150) filed by ExxonMobil; (9) a Motion to Exclude Dr. Kopstein (Rec.

Doc. No. 152) filed by Radiator; (10) a Motion to Exclude Dr. David Pyatt (Rec. Doc. No. 140)

filed by Plaintiff; (11) a Motion to Exclude Dr. Richard Monson and Dr. Ethan Natelson (Rec.

Doc. No. 141) filed by Plaintiff; and (12) a Motion to Exclude Mr. John Spencer (Rec. Doc. No.

135) filed by Plaintiff. The Court, having heard the parties' oral arguments and reviewed the

submitted memoranda and applicable law, now issues this Order and Reasons.

1

## I. BACKGROUND

This case arises out of the death of James Wagoner, Jr. on December 12, 2009, allegedly due to defects in products that contain benzene. In her Complaint, Plaintiff Macie Wagoner, who filed suit on behalf of herself and as the legal representative of the decedent, avers that as part of his work from the 1970s until 2008, the decedent frequently came into contact with products containing benzene and that as a result, he was chronically exposed to a toxic substance. Among the products that the decedent allegedly used is Liquid Wrench, which is manufactured by Defendant Radiator Specialty Co. ("Radiator"), and Varsol, which is manufactured by Defendant Exxon Mobil Corporation ("ExxonMobil"). Plaintiff alleges that as a result of chronic exposure to benzene, the decedent suffered from and eventually died of multiple myeloma (MM). In her Complaint, Plaintiff has asserted a number of claims against Defendants, including ones alleging design and warning defects. In their Answers, Defendants have denied liability.

In March 2011, Radiator filed a motion for summary judgment, arguing that its Liquid Wrench product complied with the labeling requirements of the Federal Hazardous Substances Act (FHSA), 15 U.S.C. § 1261 *et seq.*, and that as a consequence, all of Plaintiff's claims are preempted. In June 2011, the Court granted the motion in part and denied it in part. The Court found that the Liquid Wrench product complied with the FHSA and its implementing regulations and that as a result, under the express preemption clause of the FHSA, it provided adequate warnings as a matter of state law. The Court accordingly granted summary judgment as to Plaintiff's failure-to-warn claims. However, the Court concluded that the FHSA neither expressly nor impliedly preempted Plaintiff's remaining claims because the FHSA is focused on the adequacy of warnings, and not product design. The Court therefore denied Radiator's motion

2

as to Plaintiff's remaining claims.

## II. PENDING MOTIONS

The parties have now filed twelve motions. The following briefly summarizes the main contentions of the parties.

### 1. Radiator's Motion for Summary Judgment (Rec. Doc. No. 145)

Radiator has moved for summary judgment as to Plaintiff's remaining claims. Noting that Alabama law is applicable, Radiator argues that Plaintiff's remaining claims under the Alabama Extended Manufacturers' Liability Doctrine (AEMLD) fail because the Court has found that the warnings on its Liquid Wrench product are adequate under both federal and state law. Radiator asserts that as a consequence, the warnings allow it to establish as a matter of law its assumption of risk defense. It also contends that adequate warnings otherwise preclude the finding that Liquid Wrench was an "unreasonably dangerous" product under the AEMLD.

With respect to Plaintiff's non-AEMLD claims, Radiator has advanced two principal arguments. First, Radiator has suggested that the AEMLD subsumes these claims. Second, Radiator argues that Plaintiff has not adduced sufficient evidence to prevail on these claims. In particular, Radiator emphasizes that there is no evidence that it was negligent or wanton with respect to its Liquid Wrench product. Radiator concludes that summary judgment as to Plaintiff's non-AEMLD claims is therefore appropriate.

Plaintiff has filed an opposition to this motion. Plaintiff agrees that Alabama law is applicable, but she contends that under the AEMLD, an adequate warning does not obviate a manufacturer's liability. Plaintiff also argues that the AEMLD does not subsume her remaining claims and that she has adduced sufficient evidence to show negligence, wantonness, and fraud

on the part of Radiator.

### 2. Plaintiff's Cross-Motion for Partial Summary Judgment (Rec. Doc. No. 139)

Plaintiff has filed a cross-motion for partial summary judgment, which addresses only her AEMLD claims against Radiator. In her motion, Plaintiff argues that there is evidence that benzene poses a serious health risk, that there are inexpensive substitutes that could have been used to manufacture Liquid Wrench, and that Radiator knew of the dangerousness of the Liquid Wrench product that contained benzene. Plaintiff also asserts that there is no evidence to support any of the affirmative defenses that are available under the AEMLD, including the lack of causal relation, assumption of risk, and contributory negligence.

Radiator has filed an opposition to this motion. It argues that Plaintiff's motion for partial summary judgment should be denied for the reasons it has advanced in support of its own motion for summary judgment.

### 3. ExxonMobil's Motion for Summary Judgment (Rec. Doc. No. 154)

ExxonMobil has filed a motion for summary judgment, in which it has made several arguments. These contentions can be grouped as follows. First, ExxonMobil asserts that Plaintiff has not adduced evidence to show that Varsol had a warning, design, or manufacturing defect or that it was unreasonably dangerous per se under the applicable Louisiana law. Second, ExxonMobil asserts that Plaintiff has failed to provide evidence to sustain the finding of causation. It has made three specific arguments in this regard: 1) that there is no evidence that the decedent used the Varsol product that it manufactured, 2) that there is no evidence that the decedent read the warnings or labels on Varsol, and 3) that Plaintiff's allegation that the decedent suffered from and died of MM as a result of his use of Liquid Wrench precludes a

4

finding of causation as to ExxonMobil.

Plaintiff has filed an opposition to ExxonMobil's motion. Plaintiff agrees that Louisiana law is applicable, but argues that she has adduced evidence to support her claim that Varsol had a warning, design, and manufacturing defect and that it was unreasonably dangerous per se. With respect to ExxonMobil's arguments on causation, Plaintiff asserts that 1) there is evidence that the decedent used the Varsol product manufactured by ExxonMobil, 2) that the applicable Louisiana law establishes a presumption that an adequate warning would have been heeded and that ExxonMobil has not rebutted that presumption, and 3) that ExxonMobil misunderstands the law in arguing that her claim against Radiator precludes a finding of causation with respect to her claim against ExxonMobil.

### 4. Radiator's Motion to Exclude Dr. Sheila Butler and Dr. Jack Saux and for Summary Judgment (Rec. Doc. No. 147)

Radiator has moved to exclude Dr. Butler and Dr. Saux under Federal Rule of Evidence 702. These two doctors have been retained by Plaintiff to offer an opinion on both aspects of the causation inquiry in this toxic tort case: general causation – whether benzene exposure can cause MM – and specific causation – whether benzene exposure caused MM in the decedent. Radiator has presented three main contentions in support of its request to exclude Dr. Butler and Dr. Saux. First, it asserts that the two doctors are not qualified to render an expert opinion on the question of general causation. It notes that the question of whether benzene can cause MM is one that must be resolved by reference to epidemiological studies. Radiator observes that neither Dr. Butler nor Dr. Saux is an epidemiologist or a toxicologist.

Second, Radiator argues that the two doctors' opinion regarding general causation lacks a

reliable foundation. Radiator asserts that their opinion regarding the presence of an association between benzene and MM rests on an unreliable or irrelevant basis because 1) they undertook an incomplete review of the relevant literature and 2) the studies on which they did rely are either not specifically related to benzene or fail to show statistically significant results. In addition, Radiator complains that in making the further determination of whether an association actually entails a causal relationship, the two doctors failed to satisfy all of the Bradford Hill criteria, including the criterion of biological plausibility.

Third, Radiator also objects to the two doctors' opinion on the question of specific causation. According to Radiator, neither of the doctors ruled out other potential causes of MM in the decedent, and neither considered the possibility that the cause of MM in the decedent is simply unknown. Finally, Radiator has requested summary judgment in conjunction with this evidentiary motion. It notes that if Dr. Butler and Dr. Saux are excluded, then Plaintiff has no witnesses on the issues of general and specific causation. Radiator argues that the absence of competent evidence on causation would make summary judgment appropriate.

Plaintiff has filed an opposition to Radiator's motion. First, Plaintiff argues that Dr. Butler and Dr. Saux are qualified to render an opinion on general causation. Second, Plaintiff states that in rendering their opinion on general causation, the two doctors relied on studies showing statistically significant associations between benzene and MM. Third, Plaintiff contends that Dr. Butler and Dr. Saux undertook a sufficiently broad review of the relevant literature. Fourth, Plaintiff asserts that the two doctors also correctly applied the Bradford Hill criteria and that, in the alternative, the criteria merely guides, but does not control the question of whether a causal relationship underlies an association. Fifth, Plaintiff states that the two doctors did rule

6

out alternative causes in providing their opinion on specific causation.

**5. ExxonMobil's Motion to Exclude Dr. Butler and Dr. Saux and for Summary Judgment (Rec. Doc. No. 156)**

ExxonMobil has also moved to exclude Dr. Butler and Dr. Saux and, in doing so, has made arguments that are substantially similar to those of Radiator. ExxonMobil's contentions touch upon the two doctors' qualifications, the studies on which they relied to render their opinion on general causation, their Bradford Hill analysis, and their consideration of alternative causes for their opinion on specific causation. ExxonMobil has also requested summary judgment. It notes that if Dr. Butler and Dr. Saux are excluded, then Plaintiff has no witnesses on the issues of general and specific causation. ExxonMobil argues that summary judgment would therefore be appropriate. Plaintiff has filed an opposition, presenting essentially the same arguments that she has made in opposition to Radiator's motion.

**6. Radiator's Motion to Strike Affidavit of Eric Wagoner, to Exclude Bhaskar Kura, and for Summary Judgment (Rec. Doc. No. 149)**

In this motion, Radiator asks the Court to strike the affidavit of Eric Wagoner, to exclude Dr. Kura's expert testimony, and to grant summary judgment in its favor.

Radiator notes that Eric Wagoner is one of the decedent's brothers and that Mr. Wagoner testified at a deposition in October 2010 regarding the decedent's work as a mechanic while in Alabama. In particular, Mr. Wagoner's testimony related to the amount of Liquid Wrench that the decedent used, as well as the amount of ventilation at the workplace. Radiator states that after the deposition, Mr. Wagoner provided an affidavit in which he gave inconsistent statements about the amount of Liquid Wrench used and the amount of ventilation at the workplace.

Radiator asserts that because Mr. Wagoner has failed to justify this change in testimony, the affidavit must be stricken under the sham affidavit doctrine.

Radiator also argues that Dr. Kura's testimony should be excluded under Rule 702. In this case, Dr. Kura has been retained by Plaintiff to offer an opinion regarding, *inter alia*, 1) the decedent's exposure to benzene as a result of using Liquid Wrench and 2) the amount of benzene in Liquid Wrench. In its motion, Radiator argues that neither opinion is reliable. As to the decedent's exposure to benzene, Radiator asserts that Dr. Kura 1) relied on the sham affidavit of Eric Wagoner and 2) otherwise made assumptions about the decedent's work condition that are not reflected in the proffered evidence. As to his calculation of the content of benzene in the Liquid Wrench product, Radiator asserts that Dr. Kura employed a dubious method to ascertain that amount. Radiator argues that under these circumstances, Dr. Kura's testimony must be excluded.

Plaintiff has filed an opposition to Radiator's motion. Plaintiff argues that Eric Wagoner's affidavit does not contradict his deposition testimony. According to Plaintiff, it merely clarifies the testimony. As to Dr. Kura's calculation of the amount of benzene in Liquid Wrench, Plaintiff argues that it rests on a sound methodology. And with respect to Dr. Kura's assessment of the decedent's exposure to benzene, Plaintiff argues that all of his factual assumptions are grounded in the proffered evidence, including Eric Wagoner's deposition testimony and his affidavit.

### 7. ExxonMobil's Motion to Exclude Dr. Kura and for Summary Judgment (Rec. Doc. No. 151)

Dr. Kura was also retained by Plaintiff in connection with her claims against

ExxonMobil. More specifically, Dr. Kura was asked to render an opinion as to 1) the adequacy of the warnings for Varsol and 2) the decedent's exposure to benzene as a result of Varsol. In its motion, ExxonMobil asks the Court to exclude Dr. Kura's testimony regarding both of these subjects. As to the adequacy of the Varsol warnings, ExxonMobil argues that 1) Dr. Kura is not qualified to render an opinion on product labeling and 2) Dr. Kura did not identify or apply any appropriate methodology in concluding that the warnings are inadequate.

As to Dr. Kura's determination of the decedent's exposure to benzene as a result of Varsol, ExxonMobil advances several arguments. First, ExxonMobil argues that if the Court grants its separate motion to exclude Dr. Melvyn Kopstein, then Dr. Kura's testimony must also be excluded. This is because Dr. Kura relied on Dr. Kopstein's calculation of the benzene content of Varsol in making the exposure assessment for the decedent. Second, ExxonMobil asserts that Dr. Kura's opinion is not reliable because there is no evidence that the decedent actually used Varsol. Third, ExxonMobil contends that Dr. Kura's calculation is also unreliable because he erroneously assumed that Dr. Kopstein's calculation of the average exposure concentration of benzene from Varsol represents a time-weighted average.

Plaintiff has filed an opposition to ExxonMobil's motion. First, Plaintiff argues that Dr. Kura has substantial experience in environmental engineering that makes him qualified to render an opinion on the question of the adequacy of warnings. Second, Plaintiff argues that there is evidence that the decedent used Varsol. Third, Plaintiff asserts that Dr. Kura's assessment of the decedent's exposure to benzene as a result of Varsol is sound.

### 8. ExxonMobil's Motion to Exclude Melvyn Kopstein (Rec. Doc. No. 150)

Dr. Kopstein has been retained by Plaintiff to render an opinion on the benzene content

of Varsol. In its motion, ExxonMobil argues that Dr. Kopstein's testimony should be excluded in all respects. First, ExxonMobil stresses that some of the opinions expressed by Dr. Kopstein are not appropriate subjects for expert testimony. In particular, according to ExxonMobil, in addressing ExxonMobil's testing of Varsol, Dr. Kopstein sought to ascertain the credibility of ExxonMobil personnel and otherwise commented on ExxonMobil's litigation strategy.

Second, ExxonMobil briefly notes that Dr. Kopstein was not present at the time that ExxonMobil tested Varsol and thus does not have a basis upon which to opine on the validity of the testing. Third, as to Dr. Kopstein's calculation of the benzene content of Varsol, ExxonMobil states that Dr. Kopstein employed an unreliable methodology. According to ExxonMobil, Dr. Kopstein determined the amount of benzene in Varsol not by testing the product but by reviewing various literature, which address mineral spirits and not Varsol specifically.

Plaintiff has filed an opposition to ExxonMobil's motion. First, Plaintiff argues that the material that Dr. Kopstein considered in determining the amount of benzene in Varsol is of the type normally relied upon by experts. Second, Plaintiff asserts that ExxonMobil's argument regarding the absence of Dr. Kopstein from the testing is disingenuous. Plaintiff states that ExxonMobil itself did not allow Dr. Kopstein to witness the testing and that in any event, it is not necessary for an expert to observe a test in person in order to be able to opine on its soundness. Third, Plaintiff asserts that in discussing the reliability of ExxonMobil's documents regarding Varsol, Dr. Kopstein addressed subjects that are appropriate for expert testimony.

### 9. Radiator's Motion to Exclude Dr. Kopstein (Rec. Doc. No. 152)

As noted, Dr. Kopstein has been retained by Plaintiff to render an opinion regarding her claims against ExxonMobil specifically. Radiator has filed a motion asking that Dr. Kopstein be

precluded from providing testimony regarding Liquid Wrench and/or Radiator. In her response, Plaintiff has indicated that Dr. Kopstein will not offer an opinion regarding Liquid Wrench and/or Radiator in this case.

**10. Plaintiff's Motion to Exclude Dr. David Pyatt (Rec. Doc. No. 140)**

Dr. David Pyatt, a toxicologist, has been retained by Defendants to render an opinion on the question of general causation. In her motion, Plaintiff argues that Dr. Pyatt's opinion that there is insufficient epidemiological evidence for the proposition that benzene can cause MM should be excluded because it is unreliable. According to Plaintiff, some of the studies upon which Dr. Pyatt relied do not mention benzene or MM, and the studies that do discuss benzene do not involve a quantitative evaluation of benzene exposure. Plaintiff also states that in rendering his opinion, Dr. Pyatt ignored studies that find a statistically significant relationship between benzene exposure and MM. Separately, Plaintiff asks that Dr. Pyatt be precluded from testifying as to subjects not covered by his expert report, such as the link between obesity and MM. Plaintiff invokes Federal Rule of Civil Procedure 37 for this request.

Defendants oppose the motion. Defendants argue that Dr. Pyatt undertook an appropriate review of the literature to address the question of general causation. With respect to the proposed testimony regarding the link between obesity and MM, Defendants state that the subject was discussed at Dr. Pyatt's deposition, that the material on which Dr. Pyatt relied to opine on obesity and MM was made available to Plaintiff before the close of the expert discovery deadline, and that the continuance of the trial dates in this case will give Plaintiff an opportunity to re-depose Dr. Pyatt and to prepare rebuttal testimony.

**11. Plaintiff's Motion to Exclude Dr. Richard Monson and Dr. Ethan Natelson (Rec.**

**Doc. No. 141**)

Dr. Richard Monson, an epidemiologist, and Dr. Natelson, a hematologist, have also been retained by Defendants to offer an opinion on general causation. In her motion to exclude, Plaintiff raises arguments that are essentially the same as those that she makes with respect to Dr. Pyatt. Plaintiff contends that the opinion of Dr. Monson and Dr. Natelson about the question of general causation is unreliable because their review of the relevant literature is flawed. Plaintiff also asks that these two doctors be precluded from providing testimony regarding the link between obesity and MM.

Defendants oppose the motion. With respect to the two doctors' testimony on general causation, Defendants advance substantially the same observations as those in their opposition to Plaintiff's motion to exclude Dr. Pyatt. With regard to the subject of obesity, Defendants note that neither Dr. Monson nor Dr. Natelson intends to address that topic at trial.

### 12. Plaintiff's Motion to Exclude Mr. John Spencer (Rec. Doc. No. 135)

Mr. Spencer, an industrial hygienist, has been retained by Defendants to opine primarily on the amount of benzene to which the decedent was exposed as a result of Liquid Wrench and Varsol. Plaintiff seeks to exclude Mr. Spencer's testimony with respect to both Defendants. With regard to Radiator, Plaintiff argues that Mr. Spencer erred in disregarding an estimate of benzene exposure that was apparently made in a facility manufacturing Liquid Wrench; incorrectly criticized Dr. Kura's calculation of the amount of benzene in Liquid Wrench; made incorrect assumptions about the decedent's use of Liquid Wrench; and erred in rejecting Dr. Kura's calculation of the decedent's dermal exposure to benzene. With regard to ExxonMobil, Plaintiff also argues that Mr. Spencer was incorrect in rejecting Dr. Kura's dermal exposure assessment

and that he erred in determining the amount of benzene that was in Varsol. Plaintiff also contends that Mr. Spencer is not qualified to render an opinion on general causation.

Defendants oppose Plaintiff's motion. In its brief, Radiator notes that during his deposition, Mr. Spencer provided an adequate explanation as to why he has refused to give weight to the benzene exposure assessment made in the manufacturing facility; that his determination of the amount of benzene in Liquid Wrench is sound; that in rendering his opinion, he considered all of the testimony regarding the facts surrounding the decedent's use of Liquid Wrench; and that he also properly explained why, in his view, Dr. Kura's dermal exposure assessment is flawed. In its separate brief, ExxonMobil echoes Radiator's argument that Mr. Spencer properly explained his rejection of Dr. Kura's dermal exposure assessment. ExxonMobil also states that Mr. Spencer is qualified to render an opinion on general causation and that he did not err in opining on the amount of benzene in Varsol.

The Court will discuss the above motions in turn.

## III. LAW AND ANALYSIS

### A. Standard of Review for Motions for Summary Judgment

A district court can grant a motion for summary judgment only when the "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the district court "will review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986). The court must find "[a] factual dispute [to be] 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party [and a] fact [to be] 'material' if it

13

might affect the outcome of the suit under the governing substantive law." *Beck v. Somerset Techs., Inc.*, 882 F.2d 993, 996 (5th Cir. 1989) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir. 1995) (citing Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986)). The mere argued existence of a factual dispute will not defeat an otherwise properly supported motion. *See Anderson*, 477 U.S. at 248. "If the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. *Id.* at 249-50 (internal citations omitted).

**B. Radiator's Motion for Summary Judgment (Rec. Doc. No. 145) and Plaintiff's Cross-Motion for Partial Summary Judgment (Rec. Doc. No. 139)**

As noted above, Radiator has moved for summary judgment as to Plaintiff's remaining claims against it. Noting that Alabama law is applicable, Radiator argues that Plaintiff's remaining claims under the Alabama Extended Manufacturers' Liability Doctrine (AEMLD) fail because the Court has found that the warnings placed on the Liquid Wrench product are adequate as a matter of federal and state law. Radiator asserts that the warnings allow it to establish as a matter of law its assumption of risk defense and that they otherwise preclude the finding that Liquid Wrench was an "unreasonably dangerous" product. Radiator also argues that the AEMLD subsumes Plaintiff's remaining non-AEMLD claims and that Plaintiff has otherwise failed to adduce sufficient evidence to support those claims. Plaintiff has filed a cross-motion for

partial summary judgment, contending that she is entitled to judgment as a matter of law on her AEMLD claims.

**1. The applicable law**

As the Court is sitting in diversity, the threshold question of the choice of law is to be resolved by reference to the conflict-of-law rules of Louisiana. *See Houston N. Hosp. Prop. v. Telco Leasing, Inc.*, 680 F.2d 19, 21 (5th Cir. 1982). Under those rules, if the injured person was not domiciled in Louisiana at the time of the alleged injury, the state whose law is applicable is determined by evaluating the "pertinent contacts" of the states whose policies might be implicated by the case. *See* La. Civ. Code art. 3542. Here, it is undisputed that Plaintiff's claims against Radiator arise out of the decedent's work as a mechanic in Alabama during the 1970s. It is also undisputed that at that time, the decedent was a resident of Alabama. The parties are correct in suggesting that Alabama law applies to Plaintiff's claims against Radiator.

**2. Plaintiff's AEMLD Claims**

**a. The AEMLD** -- The Alabama Supreme Court discussed the Alabama Extended Manufacturers' Liability Doctrine (AEMLD) in the two companion cases of *Casrell v. Altec Industries, Inc.*, 335 So.2d 128 (Ala. 1976), and *Atkins v. American Motors Corp.*, 335 So.2d 134 (Ala. 1976). The Alabama Supreme Court held that to establish liability under the AEMLD, a plaintiff must show that 1) "he suffered injury or damages to himself or his property by one who sold a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer," 2) "the seller was engaged in the business of selling such a product," and 3) the product "was expected to, and did, reach the [plaintiff] without substantial change in the condition in which it was sold." *Atkins*, 335 So.2d at 141; *Casrell*, 335 So.2d at 132-33.

15

In so holding, the Alabama Supreme Court largely adopted Section 402A of the Second Restatement of Torts. *See Atkins*, 335 So.2d at 143 (noting that a plaintiff's prima facie case "is established when the plaintiff proves substantially the elements set out" in Section 402A). Nonetheless, the court insisted that unlike the Restatement, which provides for strict liability, *see* Restatement (Second) of Torts § 402A (1965), a claim under the AEMLD is one that sounds in negligence, *see Atkins*, 335 So.2d at 141 ("We simply hold that selling a dangerously unsafe product is negligence as a matter of law."); *Casrell*, 335 So.2d at 132 ("We do not intend to impose a no-fault concept.").

In addition to laying out the elements of a plaintiff's claim under the AEMLD, the Alabama Supreme Court also held that a number of defenses are available. *See Atkins*, 335 So.2d at 143; *see also Casrell*, 335 So.2d at 134. The court explained that a defendant may establish a general denial defense, whereby it shows that the plaintiff has not proven an element of his prima facie case. *See Atkins*, 335 So.2d at 143; *see also Casrell*, 335 So.2d at 134. The court also held that a defendant may assert several affirmative defenses, including the lack of causal relation, assumption of risk, and contributory negligence. *See Atkins*, 335 So.2d at 143; *see also Casrell*, 335 So.2d at 134.

In this case, Radiator argues that it cannot be held liable under the AEMLD because the warnings that it provided on the Liquid Wrench product have been found to be adequate as a matter of law. Radiator correctly notes that this Court has found that the warnings that appeared on the Liquid Wrench product comply with the requirements of the FHSA. The Court has also held that as a result, under the express preemption provision of the FHSA, the warnings are adequate as a matter of state law. Radiator is correct in arguing that in light of these findings, it

16

cannot be held liable under the AEMLD. But this conclusion requires further elaboration.

**b. Adequate warnings and assumption of risk** -- In the course of discussing the affirmative defense of assumption of risk, the Alabama Supreme Court in *Atkins* stated that "[t]he defendant may establish that . . . [it] adequately warned the consumer of the danger." *Atkins*, 335 So.2d at 143. In other words, according to the court, the presence of an adequate warning may support the finding that by using the product, the plaintiff assumed the risk of injury. *See id.* In its brief, Radiator relies on this notion to argue that it has established as a matter of law the affirmative defense of assumption of risk and that accordingly, it is entitled to summary judgment on Plaintiff's remaining AEMLD claims. This contention is not persuasive.

Since *Atkins*, the Alabama Supreme Court has had the opportunity to elaborate on the nature of the defense of assumption of risk. It has emphasized that to prevail on this defense, a defendant must prove that "the plaintiff had knowledge of, and an appreciation of, the danger [he] faced." *Ex Parte Potmesil*, 785 So.2d 340, 343 (Ala. 2000). In this inquiry, "the plaintiff's state of mind is determined by [a] *subjective* standard." *McIsaac v. Monte Carlo Club, Inc.*, 587 So.2d 320, 324 (Ala. 1991) (emphasis added). In other words, "assumption of the risk proceeds from the injured person's *actual* awareness of the risk." *Id.* (emphasis added). The defense is not established "[i]n cases where the defendant fails to show that the plaintiff subjectively appreciated the danger." *Ex Parte Potmesil*, 785 So.2d at 343.

The relationship between assumption of risk and product warnings was addressed in the Alabama Supreme Court's subsequent decision in *Horn v. Fadal Machining Centers, LLC*, 972 So.2d 63 (Ala. 2007). In that case, the decedent was operating a milling machine when a cutting tool in the milling machine broke and flew out of the machine, striking the decedent in the

17

throat. *Id.* at 67-68. The manual for the machine, as well as warning stickers on the machine, warned that the machine was not to be operated with its doors open. *Id.* The defendant argued that its warnings were adequate and that by failing to heed the warnings, the decedent assumed the risk of injury. *Id.* at 74. The Alabama Supreme Court was unpersuaded. *Id.* at 74-75.

The court reiterated that the key to the defense of assumption of risk is the plaintiff's subjective awareness of the particular risk that caused the injury. *See id.* at 75. Thus, an assumption of risk defense is established if 1) the warning covers the risk that underlies the action and 2) the warning was in fact read by the injured person. *See id.* at 75-79. In *Horn*, the court found that 1) it was unclear whether the warning could be understood to refer to the specific risk that was at issue, *see id.* at 77-78, and 2) the defendant had failed to present evidence that the decedent had previously read the manual, *id.* at 79. The court therefore declined to hold that the defendant had established as a matter of law the defense of assumption of risk. *Id.*

The Alabama Supreme Court's analysis in *Horn* makes it clear that as *Atkins* indicated, "the presence of an adequate warning *may* be part of a defendant's assumption of the risk defense." *Id.* at 74 (internal citation omitted) (emphasis added). However, it demonstrates that the adequacy of a warning for the purpose of establishing the affirmative defense is not the same as the adequacy of a warning for the purpose of undermining a prima facie case for a warning-defect claim. To enable a defendant to prevail on the affirmative defense of assumption of risk, a warning must be of such specificity that it conveyed to the injured person an "actual awareness of the risk" that underlies the claim. *Id.* at 75 (quoting *McIsaac*, 587 So.2d at 324). For a warning to undermine the prime facie case for a warning-defect claim, however, it merely needs

18

to be the result of the "exercise [of] reasonable diligence" on the part of the defendant. *King v. S.R. Smith, Inc.*, 578 So.2d 1285, 1287 (Ala. 1991).

Here, Radiator's attempt to prevail as a matter of law on the affirmative defense of assumption of risk falls short. Although it is true that this Court has found that the warnings on the Liquid Wrench product are adequate to defeat Plaintiff's failure-to-warn claims, the warnings do not convey anything more than a "general awareness" that Liquid Wrench may pose a danger. *Horn*, 972 So.2d at 77. Moreover, Radiator has not pointed to evidence that the decedent, in fact, read the warnings on the Liquid Wrench product. *Cf. id.* at 79. Thus, Radiator has not shown that its warnings gave the decedent "a conscious appreciation or actual awareness of the *specific danger* [that has been] made the basis of this action," namely blood disorders such as MM. *Id.* at 77 (internal quotation marks omitted). Under these circumstances, Radiator has not established as a matter of law its affirmative defense of assumption of risk.

**c. Adequate warnings and design defects** -- The question remains as to whether the finding of this Court that the warnings attached to the Liquid Wrench product are adequate for the purpose of Plaintiff's failure-to-warn claims should otherwise preclude liability with respect to Plaintiff's remaining AEMLD claim. As Plaintiff's own motion for partial summary judgment indicates, her remaining AEMLD claim is one that alleges a design defect in Liquid Wrench. According to Plaintiff, Liquid Wrench could have been designed without using benzene in order to make it equally effective, but safer. In its brief, however, Defendant asserts that its adequate warnings obviated any danger posed by the Liquid Wrench product. Thus, the question that remains is whether the presence of adequate warnings defeats Plaintiff's claim of a design defect.

The answer is in the affirmative. As one federal court foretold, it is the case that under

the AEMLD, "a defendant who convinces the factfinder that a warning label was adequate may not be held liable." *Pitts v. Dow Chem. Co.*, 859 F. Supp. 543, 551 (M.D. Ala. 1994). Indeed, in *Tillman v. R.J. Reynolds Tobacco Co.*, 871 So.2d 28 (Ala. 2003), the Alabama Supreme Court held that "even if" cigarettes are "unreasonably dangerous," it is the case that "liability under the AEMLD is 'obviated by [the presence of] an adequate warning.'" *Id.* at 34 (per curiam) (quoting *Casrell*, 335 So.2d at 133) (emphasis added).[1] In other words, even if there is a safer design that could reasonably be implemented to eliminate a risk of danger, the presence of an adequate warning obviates any duty on the part of the manufacturer to implement such a design.

To be sure, whether a warning is adequate is often a contested issue of fact that is to be determined by the jury. *See, e.g.*, *Hicks v. Commercial Union Ins. Co.*, 652 So.2d 211, 217 (Ala. 1994); *Bean v. BIC Corp.*, 597 So.2d 1350, 1353-54 (Ala. 1992); *Deere & Co. v. Grose*, 586 So.2d 196, 199 (Ala. 1991). Here, however, the Court has found, as a matter of federal law, that the Liquid Wrench product had the warnings required under the FHSA and its implementing regulations. The Court has also held that as a consequence, under the express preemption provision of the FHSA, the warnings are adequate as a matter of state law. The presence of adequate warnings therefore precludes liability under the AEMLD. *See Tillman*, 871 So.2d at 34; *Pitts*, 859 F. Supp. at 551.[2]

---

[1] Six justices joined the relevant portion of the per curiam opinion. *See Tillman*, 871 So.2d at 35 (per curiam) (noting that two justices joined the per curiam opinion in full); *id.* at 36-37 (Moore, C.J., concurring in part and dissenting in part) (noting the concurrence of three justices to the relevant part of the per curiam opinion); *id.* at 36 (See, J., concurring in part and dissenting in part) (noting the justice's concurrence to the relevant part of the per curiam opinion).

[2] At oral argument, Plaintiff sought to distinguish *Tillman* on the ground that the case involved cigarettes. This effort is unavailing. The fact that cigarettes were the products at issue

The Alabama Supreme Court's approach to this issue in *Tillman* is in stark contrast to that of the Restatement. Under the Restatement, the fact that a defendant has prevailed on a warning defect claim does not necessarily mean that it cannot be held liable for a design defect. *See* Restatement (Third) of Torts: Products Liability § 2 cmt. l (1998). It is only "when an alternative design to avoid risks cannot reasonably be implemented" -- in other words, when a product is unavoidably unsafe -- that "adequate instructions and warnings" will preclude liability. *Id.* This rule has the salutary effect of ensuring that risks be designed away whenever it is reasonable to do so. *Id.* It helps to minimize and even eliminate any residual risk that remains after the placement of an otherwise adequate warning. *Id.*

In *Casrell*, the Alabama Supreme Court hinted at this approach when it stated in the course of discussing what makes a product "unreasonably dangerous" that the "danger *may be* obviated by an adequate warning." *Casrell*, 335 So.2d at 133 (emphasis added). By using the word "may," the court indicated that while there are certainly cases where a product cannot be deemed "unreasonably dangerous" because it carries "an adequate warning," there are also cases where a product can be deemed "unreasonably dangerous" despite having an adequate warning. *Id.* As noted, this is consistent with the Restatement's approach to the question of whether an adequate warning may defeat a design defect claim.

Subsequent cases hewed to this approach. In *Stone v. Smith, Kline & French*

did play an important role in the Alabama Supreme Court's determination that cigarettes are not "unreasonably dangerous." *See Tillman*, 871 So.2d at 33-34. However, the court went further and held that "*even if*" cigarettes are "unreasonably dangerous," liability under the AEMLD is obviated by adequate warnings. *Id.* at 34 (emphasis added). In reaching this critical alternative holding, the Alabama Supreme Court did not attach any significance to the fact that cigarettes were at issue. *See id.* And it is this conclusion that requires summary judgment as to Plaintiff's remaining AEMLD claims.

21

*Laboratories*, 447 So.2d 1301 (Ala. 1984), the court held that adequate warnings precluded the plaintiff from establishing that the product was "unreasonably dangerous." *Id.* at 1304. But it recognized that the product at issue was "unavoidably unsafe." *See id.* Similarly, in *Yarbrough v. Sears, Roebuck & Co.*, 628 So.2d 478 (Ala. 1993), the Alabama Supreme Court held that the product could not be deemed "unreasonably dangerous" in part because of the warnings on the product. *Id.* at 481, 482. The court, however, also rested its holding on the fact that the plaintiff had failed to show that any risk inherent in the product could be designed away -- in other words, that there was a design defect. *Id.* at 482.

The court's holding in *Tillman* -- that an adequate warning, in and of itself, precludes a design defect claim -- therefore represents not only a significant departure from the Restatement, but also a shift from the court's prior precedents. Under our federal system, however, "the highest court of the state is the final arbiter of what is state law." *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 236 (1940). And this Court is "bound to follow the latest decision . . . of the [Alabama] Supreme Court." *Melvin v. Loats*, 23 So.3d 666, 671 (Ala. Civ. App. 2009) (quoting *State v. Bilotta*, 522 So.2d 300, 301 (Ala. Civ. App. 1988)). As noted above, the presence of adequate warnings precludes AEMLD liability. Accordingly, Radiator's motion must be granted with respect to Plaintiff's remaining AEMLD claim.

### 3. Plaintiff's Non-AEMLD Claims

**a. Whether the claims are subsumed under the AEMLD** – In its motion, Radiator argued that Plaintiff's non-AEMLD claims merge with her AEMLD claims. In support of this proposition, Radiator cited to *Wakeland v. Brown & Williamson Tobacco Corp.*, 996 F. Supp. 1213 (S.D. Ala.1998). There, the court concluded that the AEMLD subsumes non-AEMLD

claims, such as common-law negligence. *Id.* at 1217. The decision in *Wakeland*, it is worth noting, is not the only one that, in the past, concluded that negligence and other non-AEMLD claims are subsumed under the AEMLD. *See, e.g., Grimes v. Gen. Motors Corp.*, 205 F. Supp. 2d 1292, 1294 (M.D. Ala. 2002); *Brock v. Baster Healthcare Corp.*, 96 F. Supp. 2d 1352, 1356 n.2 (S.D. Ala. 2000).

As Radiator acknowledged at oral argument, however, reliance on *Wakeland* is misplaced. In *Tillman*, the Alabama Supreme Court held that the AEMLD does not subsume other common-law actions, such as ones that allege negligence and wantonness. *See Tillman*, 871 So.2d at 34-35 (per curiam).[3] Since then, the court has adhered to that holding. *See, e.g., Vesta Fire Ins. Corp. v. Milam & Co. Constr., Inc.*, 901 So.2d 84, 102 (Ala. 2004). As noted above, "the highest court of the state is the final arbiter of what is state law." *West*, 311 U.S. at 236. The Alabama Supreme Court's conclusion that negligence and other non-AEMLD claims do not merge with the AEMLD precludes summary judgment on the ground asserted by Radiator.

**b. Whether sufficient evidence has been proffered** – Radiator has raised the separate contention that the proffered evidence is insufficient to sustain Plaintiff's non-AEMLD claims. In response, Plaintiff argues that she has adduced evidence to support her claims of negligence, wantonness, and fraud. The Court will address these in turn.

---

[3] Eight justices joined the relevant portion of the per curiam opinion. *See Tillman*, 871 So.2d at 35 (per curiam) (noting the concurrence of two justices with the entirety of the per curiam opinion); *id.* at 36-37 (Moore, C.J., concurring in part and dissenting in part) (noting the concurrence of three justices to the relevant part of the per curiam opinion); *id.* at 37-38 (Lyons, J., concurring in part and dissenting in part) (noting the justice's concurrence to the relevant part of the per curiam opinion); *id.* at 38 (Woodall, J., concurring in part and dissenting in part) (same); *id.* (Johnstone, J., concurring specially in part and dissenting in part) (same).

**i. Negligence**: The Alabama Supreme Court has recognized that common-law negligence is a theory available to a plaintiff in a product liability case. *See, e.g.*, *Ford Motor Co. v. Burdeshaw*, 661 So.2d 236, 237-38 (Ala. 1995). "Negligence is the failure to do what a reasonably prudent person would have done under the same or similar circumstances, or the doing of something that a reasonably prudent person would not have done under the same or similar circumstances." *Id.* at 238 (citing *Elba Wood Prods., Inc. v. Brackin*, 356 So.2d 119 (Ala. 1978)). "To recover under a negligence claim, the plaintiff must establish (1) that the defendant owed a duty to the plaintiff; (2) that the defendant breached that duty; (3) that the plaintiff suffered a loss or an injury; and (4) that the defendant's negligence was the actual and proximate cause of that loss or injury." *Id.* (citing *Lollar v. Poe*, 622 So.2d 902 (Ala. 1993)).

In this case, Radiator does not dispute that it owed to the decedent a duty to exercise reasonable care with respect to its Liquid Wrench product. The rule that "a manufacturer may be liable for negligence to remote users has been long-established in Alabama." *Medley v. United States*, 480 F. Supp. 1005, 1009 (M.D. Ala. 1979) (citing *Crane Co. v. Davies*, 8 So.2d 196 (Ala. 1942); *Miles v. Chrysler Corp.*, 191 So. 245 (Ala. 1939)). Nor has Radiator suggested that Plaintiff has not suffered a loss or an injury, although, to be sure, the precise amount of Plaintiff's damages may be in dispute. Instead, Radiator's principal argument is that Plaintiff has not adduced any evidence showing that it breached its duty to exercise reasonable care.[4]

In response, however, Plaintiff has pointed to evidence that could support a finding of

---

[4] Radiator also disputes the causation element of Plaintiff's claim, but only on the ground that Plaintiff has not provided evidence that is admissible under *Daubert* to prove general and specific causation. Radiator has separately requested summary judgment in conjunction with its *Daubert* motions. Therefore, for the purpose of this particular motion, the element of causation is also not at issue.

negligence. Indeed, there is evidence that at the relevant time, Radiator used Raffinate, which was produced by U.S. Steel Corporation, to manufacture the non-deodorized version of Liquid Wrench. Pl.'s Ex. 15 (Rec. Doc. No. 251-15 at 3-4); Pl.'s Ex. 19 (Rec. Doc. No. 251-19 at 4). There is also evidence that in the spring of 1963, Radiator asked U.S. Steel to specify the amount of benzene in Raffinate, Pl.'s Ex. 18 (Rec. Doc. No. 251-18 at 1), and that, in response, U.S. Steel informed Radiator that the estimated benzene content of Raffinate was 5 percent, Pl.'s Ex. 21 (Rec. Doc. No. 251-21 at 1).

In addition, there is evidence that U.S. Steel prepared a safety data sheet regarding Raffinate for dissemination to its customers and that at all relevant times, Radiator was the only customer of U.S. Steel that purchased Raffinate. Pl.'s Ex. 19 (Rec. Doc. No. 251-19 at 4, 11-12). Moreover, the safety data sheet states that "[t]he toxicity of Raffinate is principally due to its benzene content" and that "[i]n severe cases, the bone marrow is affected so as to produce blood cell deficiencies." Pl.'s Ex. 20 (Rec. Doc. No. 251-20 at 6, 7). The document indicates that "[c]hronic exposure to low concentrations of the [Raffinate] vapors can cause severe damage to the blood-forming structures" and that "[r]egular employees should have regular, periodic blood studies." *Id.* (Rec. Doc. No. 251-20 at 3, 7). Finally, there is evidence that at all relevant times, Radiator manufactured and marketed a deodorized version of Liquid Wrench, which did not contain benzene. Pl.'s Ex. D (Rec. Doc. No. 139-7 at 12).

Viewing this evidence in the light most favorable to Plaintiff, the Court finds that it can support the finding of negligence. Indeed, a jury could conclude that a reasonable manufacturer would have altered the design of the non-deodorized formula of Liquid Wrench or withdrawn the Raffinate formula of Liquid Wrench and that Radiator's failure to do so was a breach of its duty

to exercise due care. Radiator resists this conclusion by arguing that there is no evidence that the safety data sheet was ever received by Radiator. The aforementioned evidence, however, supports the reasonable inference that Radiator did receive the information. Indeed, there is evidence that the safety data sheet was written for U.S. Steel customers and that at the relevant time, Radiator was the only U.S. Steel customer that purchased Raffinate. In its motion, Radiator also emphasizes that the safety data sheet does not specifically mention cancer or otherwise characterize benzene as a carcinogen. However, consistent with Plaintiff's theory of the case, the document does describe the risk of damage to blood and blood-forming organs.

To be sure, as Radiator also suggests, a reasonable jury reviewing the evidence that the parties have adduced thus far could also conclude that Radiator did, in fact, exercise reasonable care. It is undisputed that at all relevant times, Radiator took steps to ensure that warnings were put in place on the label of the Liquid Wrench product. Those warnings instruct users to "[r]ead [the] cautionary directions carefully." Def.'s Ex. F (Rec. Doc. No. 145-8 at 4). The directions, in turn, tell users to use the product "only with adequate ventilation" and to "[a]void prolonged or repeated breathing of vapor and contact with skin." *Id.* A reasonable jury could find that the placement of these and other warnings constituted a reasonable response to the information indicating that chronic exposure to benzene could lead to blood disorders.

At this stage of the case, however, the determination as to whether it was reasonable for Radiator to place these warnings on the product instead of either withdrawing the Raffinate version of Liquid Wrench from the market or otherwise modifying the formula for the non-deodorized version of Liquid Wrench is a question that is properly directed toward the jury. In light of the evidence, the Court cannot at this time resolve as a matter of law the question of

26

whether Radiator exercised reasonable care. Accordingly, summary judgment as to Plaintiff's negligence claim is inappropriate.

**ii. Wantonness**: Under Alabama law, "[w]antonness is the doing of some act or omission to do some act with reckless indifference to the knowledge that such act or omission will likely or probably result in injury." *Bishop v. Poore*, 475 So.2d 486, 487 (Ala. 1985). Thus, to establish wantonness, a plaintiff must show that 1) the defendant knew that "injury would likely or probably result from his conduct" and that 2) the defendant acted "consciously and intentionally . . . with reckless indifference to [these] consequences." *Miller v. Bailey*, 60 So.3d 857, 867 (Ala. 2010) (quoting *Smith v. Roland*, 10 So.2d 367, 369 (Ala. 1942)).

As noted above, Plaintiff in this case has pointed to evidence showing that Radiator knew that the Raffinate it used to produce the non-deodorized version of Liquid Wrench at the relevant time contained benzene. There is also evidence showing that Radiator was informed by U.S. Steel that the toxicity of Raffinate was due to its benzene content; that "[i]n severe cases, the bone marrow is affected so as to produce blood cell deficiencies"; and that "[c]hronic exposure to low concentrations of the [Raffinate] vapors can cause severe damage to the blood-forming structures." Pl.'s Ex. 20 (Rec. Doc. No. 251-20 at 3, 6, 7). When viewed in the light most favorable to Plaintiff, this evidence can support the finding of wantonness.

Of course, the evidence also strongly supports the notion that Radiator did not act "with reckless indifference" to the safety of others. *Miller*, 60 So.3d at 867. As Radiator has stressed and as noted above, Radiator took steps to ensure that the label on the Liquid Wrench product complied with the mandates of the FHSA. Radiator put in place warnings stating that Liquid Wrench should be used only if there is adequate ventilation and that users should avoid vapors

and contact with the skin. Def.'s Ex. F (Rec. Doc. No. 145-8 at 4). In light of these measures, it may be difficult to find that in producing and distributing the Liquid Wrench product, Radiator acted with "reckless indifference" to the safety of others. *Miller*, 60 So.3d at 868. At this stage of the case, however, the Court finds that these competing views preclude summary judgment. The Court may, however, revisit this question in the context of a Rule 50 motion.

**iii. Fraudulent misrepresentation/fraudulent suppression**: Alabama law recognizes causes of action for both fraudulent misrepresentation, which involves an affirmatively false representation, and fraudulent suppression, which involves a concealment or a failure to disclose. *See Cook's Pest Control, Inc. v. Rebar*, 28 So.3d 716, 724-25 (Ala. 2009). To prevail on a claim of fraudulent misrepresentation, a plaintiff must show, *inter alia*, that there was reliance on the false representation. *Boswell v. Liberty Nat'l Life Ins. Co.*, 643 So.2d 580, 581 (Ala. 1994). Similarly, to succeed on a claim of fraudulent suppression, a plaintiff must demonstrate, *inter alia*, that "the concealment or failure to disclose induced the plaintiff to act." *Booker v. United Am. Ins. Co.*, 700 So.2d 1333, 1339 n.10 (Ala. 1997).

In this case, Plaintiff suggests that she has a viable claim of fraudulent misrepresentation and fraudulent suppression against Radiator. She contends that the Material Safety Data Sheet (MSDS) for Liquid Wrench should have disclosed the risk of blood disorders. Plaintiff, however, has not cited evidence to support the elements of reliance or inducement, which are essential to the claims of fraudulent misrepresentation and fraudulent suppression. In particular, Plaintiff has not pointed to evidence that the decedent relied on any representations in the MSDS or that any failure to disclose the risk of blood disorders in the MSDS induced the decedent to use the product. Thus, even if one were to assume *arguendo* that Plaintiff has adduced evidence relevant

28

to the other elements, it is clear that Radiator is entitled to summary judgment as to these claims.

### 4. Summary

For the reasons stated above, Radiator's Motion for Summary Judgment must be granted in part and denied in part. Summary judgment with respect to Plaintiff's remaining AEMLD claim, as well as her claims of fraudulent suppression and fraudulent misrepresentation, is appropriate. Summary judgment as to Plaintiff's negligence and wantonness claims is not warranted, however. In addition, Plaintiff's cross-Motion for Partial Summary Judgment, which addresses Plaintiff's AEMLD claim, must be denied.

## C. ExxonMobil's Motion for Summary Judgment (Rec. Doc. No. 154)

In its motion, ExxonMobil raises several arguments in support of its request for summary judgment. These contentions can be grouped as follows. First, ExxonMobil asserts that Plaintiff has not adduced evidence to show that Varsol had a warning, design, or manufacturing defect or that it was unreasonably dangerous per se under the applicable Louisiana law. Second, ExxonMobil asserts that Plaintiff has failed to provide evidence to sustain the finding of causation. It makes three specific arguments in this regard: 1) there is no evidence that the decedent used the Varsol product manufactured by ExxonMobil, 2) there is no evidence that the decedent read the warnings or labels on Varsol, and 3) Plaintiff's allegation that the decedent suffered from and died of MM as a result of his use of Liquid Wrench precludes a finding of causation as to ExxonMobil.

### 1. The applicable law

As noted above, in this case, the threshold question of the choice of law is to be resolved by reference to the conflict-of-law rules of Louisiana. *See Houston N. Hosp. Prop.*, 680 F.2d at

21. Under those rules, if the alleged injury was sustained in Louisiana and if the injured person was domiciled in Louisiana at the relevant time, then Louisiana law is applicable. *See* La. Civ. Code art. 3545. Here, it is undisputed that Plaintiff's claim against ExxonMobil arises out of the decedent's work in Louisiana from around 1981 to 1983. It is also undisputed that at that time, the decedent was a resident of Louisiana. The parties are thus correct in suggesting that Louisiana law applies to Plaintiff's claims against ExxonMobil.

In addition, the parties agree that Louisiana law as it existed before the enactment of the Louisiana Products Liability Act (LPLA), La. Rev. Stat. Ann. § 9:2800.51 *et seq.*, is applicable. This suggestion is also correct. The Louisiana Supreme Court has held that the LPLA altered substantive rights and that as a result, "it is not retroactive." *See Gilboy v. Am. Tobacco Co.*, 582 So.2d 1263, 1264-65 (La. 1991). Accordingly, the principles of law that are applicable to Plaintiff's claims against ExxonMobil are those that were articulated by the Louisiana Supreme Court in *Weber v. Fidelity & Casualty Insurance Co. of New York*, 250 So.2d 754 (La. 1971), and subsequent cases such as *Halphen v. Johns-Mansville Sales Corp.*, 484 So.2d 110 (La. 1986).

### 2. Whether Varsol was unreasonably dangerous

To prevail on a product liability action under pre-LPLA Louisiana law, a plaintiff must prove that the product is "unreasonably dangerous to normal use." *Weber*, 250 So.2d at 755. The Louisiana Supreme Court has identified four theories by which a plaintiff can show that a product is "unreasonably dangerous." *Halphen*, 484 So.2d at 113-15. In particular, a product is "unreasonably dangerous" if it has 1) a warning defect, 2) a design defect, 3) a manufacturing defect or if 4) it is unreasonably dangerous per se. *See id.* In this case, ExxonMobil contends that

Plaintiff has not provided sufficient evidence to show that Varsol was unreasonably dangerous in any of these ways. The Court will discuss the possibilities in turn.

**a. Warning defect** -- A product is "unreasonably dangerous" if "the manufacturer fails to adequately warn about a danger related to the way the product is designed." *Halphen*, 484 So.2d at 114-15. In particular, "[a] manufacturer is required to provide an adequate warning of any danger inherent in the normal use of its product which is not within the knowledge of or obvious to the ordinary user." *Id.* at 115. Thus, "when the danger is known to the manufacturer and cannot justifiably be expected to be within the knowledge of users generally, the manufacturer must take reasonable steps to warn the user." *Chappuis v. Sears Roebuck & Co.*, 358 So.2d 926, 930 (La. 1978).

The Louisiana Supreme Court has identified a number of non-exhaustive factors relevant to the determination of whether a warning is adequate. These include "the severity of the danger, the likelihood that the warning will catch the attention of those who will foreseeably use the product and convey the nature of the danger to them, the intensity and form of the warning, and the cost of improving the strength or mode of the warning." *Bloxom v. Bloxom*, 512 So.2d 839, 844 (La. 1987) (internal citations omitted). A duty that is subsumed within the duty to warn is the duty of a manufacturer "to test and inspect its product" in a way that is "commensurate with the dangers involved." *Halpens*, 484 So.2d at 115.

In its motion, ExxonMobil argues that Plaintiff has failed to provide evidence of what constitutes an "adequate" warning," *id.*, or "reasonable steps," *Chapppuis*, 358 So.2d at 930. In response, however, Plaintiff points to the report of Dr. Kopstein, who gave the opinion that Varsol is a defective product because its labels and its MSDS "do not mention the presence of

31

benzene, let alone warn about its known health risks." Pl.'s Ex. C (Rec. Doc. No. 162-4 at 44).

Plaintiff also cites the report of Dr. Kura, who wrote that ExxonMobil "fail[ed] to identify

[b]enzene as a hazardous ingredient on the MSDS sheets and warning labels and the potential to

cause damage to the blood and blood forming organs[,] including cancer." Pl.'s Ex. D (Rec. Doc.

No. 162-5 at 18).

In light of this, it is clear that Plaintiff has put forward evidence to support her warning

defect claim. Indeed, Plaintiff has offered evidentiary support for the notion that the content of

Varsol's warning label and MSDS should have been expanded to discuss benzene and the risks

of blood disorders. In its brief, ExxonMobil attacks the qualifications of Dr. Kura to render an

opinion on the issue of warnings, as well as the reliability of the opinions. Such questions,

however, lie, in the first instance, in the domain of *Daubert*. Without first concluding that the

opinions of Dr. Kura and Dr. Kopstein are inadmissible, the Court cannot say that Plaintiff has

failed to present sufficient evidence in support of her warning defect claim.[5]

In its reply brief, ExxonMobil suggests that at the time that the decedent used Varsol,

there were insufficient studies showing a link between benzene and MM and that, as a

consequence, it could not have known at that time that benzene can cause MM. According to

ExxonMobil, this precludes liability with respect to Plaintiff's warning defect claim. This

contention is also unavailing. To be sure, it is true that under the applicable Louisiana law, a

manufacturer's duty to warn "is governed by the standard of knowledge available to the

---

[5] ExxonMobil has made a separate request for summary judgment as part of its motion to exclude Dr. Kura. As noted below, the Court reserves ruling on whether Dr. Kura is qualified to render an opinion on product labeling, whether his opinion on the issue of warnings is reliable, and whether summary judgment on that ground is appropriate.

manufacturer . . . at the [relevant] time." *Toups v. Sears, Roebuck & Co.*, 507 So.2d 809, 818 (La. 1987); *accord* Restatement (Third) of Torts: Products Liability § 2 cmt. a (1998) (noting that the duty to warn hinges on "the knowledge of risks . . . reasonably attainable at the time of distribution").

ExxonMobil's argument, however, neglects Plaintiff's theory of the case. As Plaintiff's expert opinions indicate, Plaintiff in this case is asserting that the danger posed by benzene is the risk of blood-related diseases. Pl.'s Ex. D (Rec. Doc. No. 162-5 at 18). Plaintiff has further argued that at the relevant time, the scientific literature was such that ExxonMobil either knew or should have known that benzene has a harmful effect on blood and blood-forming organs. For instance, Plaintiff has pointed to an ExxonMobil document from 1958, which states that "[t]he greatest hazard associated with benzene exposures is an insidious destructive effect on blood-forming organs." Pl.'s Ex. 1 (Rec. Doc. No. 251-1 at 1, 3). The document also states that "[t]his [hazard] is most often the result of prolonged or repeated inhalation of vapor in low concentrations." *Id.* Plaintiff has put forward evidence comporting with the requirement that a manufacturer's duty to warn "is governed by the standard of knowledge available to the manufacturer . . . at the [relevant] time." *Toups*, 507 So.2d at 818.

**b. Design defect** -- Under pre-LPLA Louisiana law, there are three possible ways in which a product can be unreasonably dangerous in design. First, a product is unreasonably dangerous in design if "[a] reasonable person would conclude that the danger-in-fact, whether foreseeable or not, outweighs the utility of the product." *Halphen*, 484 So.2d at 115. Second, a product is unreasonably dangerous in design if "alternative products [are] available to serve the same needs or desires with less risk of harm." *Id.* Third, a product is unreasonably dangerous in

33

design if "there [is] a feasible way to design the products with less harmful consequences." *Id.*

ExxonMobil briefly suggests that Plaintiff has not adduced evidence of a design defect, but in response, Plaintiff points to the opinion of Dr. Kura, who concluded in his expert report that there are alternative formulas for Varsol that involve less expensive and safer substitutes and that ExxonMobil should have removed benzene from Varsol. Pl.'s Ex. D (Rec. Doc. No. 162-5 at 18). ExxonMobil rejects the soundness of this opinion, but the degree to which this opinion is sufficiently reliable to be admitted as evidence under *Daubert*, and the extent to which this opinion ought to be deemed credible, are questions that are beyond the scope of this summary judgment motion.[6]

**c. Manufacturing defect** -- A product is "unreasonably dangerous in construction or composition if at the time it leaves the control of its manufacturer it contains an unintended abnormality or condition which makes the product more dangerous than it was designed to be." *Halphen*, 484 So.2d at 114. To show that a product has a flaw in its "construction or composition," the plaintiff need not prove that "there was any negligence on [the manufacturer's] part in creating or failing to discover the flaw." *Id.* The inquiry is simply whether the product "failed to conform to the manufacturer's own standards." *Id.*

In this case, Plaintiff asserts that she is pursuing a manufacturing defect claim and that she has adduced sufficient evidence in support of such a claim. But this argument is not persuasive: Plaintiff has not identified evidence of ExxonMobil's standard for the amount of

---

[6] With respect to Plaintiff's design defect claim, ExxonMobil has reiterated the argument that there were not enough studies in the early 1980s to apprise it of a link between benzene and MM and that, accordingly, it could not have foreseen that Varsol was defective. This argument fails for the reason stated above – that it neglects Plaintiff's theory of the case.

benzene in the Varsol product in the early 1980s, when the decedent allegedly used the product.

In her brief, Plaintiff cites to evidence that, based on inspections from 1987 to 1990,

ExxonMobil found that the benzene content of Varsol ranged from 1.1 ppm to 57.2 ppm. Pl.'s

Ex. E (Rec. Doc. No. 162-6 at 4). But this is simply a description of the product, and not of the

standard for the product. Plaintiff has also failed to adduce evidence that would reasonably

support the inference that any product manufactured in 1987 through 1990 reflects

ExxonMobil's standard for the product in the relevant time period – the early 1980s.

Because Plaintiff has not pointed to evidence that the Varsol product allegedly used by

the decedent contained more benzene than ExxonMobil itself wanted to include in Varsol,

summary judgment as to Plaintiff's manufacturing defect claim is appropriate.

**d. Unreasonably dangerous per se** – A product is "unreasonably dangerous per se if a

reasonable person would conclude that the danger-in-fact of the product, whether foreseeable or

not, outweighs the utility of the product." *Halphen*, 484 So.2d at 114. The focus of this inquiry is

on the actual danger of the product regardless of "whether the manufacturer perceived or could

have perceived" it. *Id.* In addition, the test looks to the benefits that are "actually found to flow

from the use of the product." *Id.* In her brief, Plaintiff suggests that she has adduced evidence

that Varsol is unreasonably dangerous per se. But her argument is unpersuasive. While she has

pointed to evidence suggesting that Varsol posed a danger, she has not cited to any evidence that

measures the utility of the product and weighs that utility against the possibility of injury. Under

these circumstances, summary judgment as to Plaintiff's claim that Varsol was unreasonably

dangerous per se is also warranted.

**3. Whether any defects in Varsol caused injuries to and the death of the decedent**

ExxonMobil has raised several arguments related to causation. First, ExxonMobil has argued that there is no evidence that the decedent used Varsol. Second, ExxonMobil asserts that, with respect to Plaintiff's failure-to-warn claim, there is no evidence that the decedent read any warning labels on the Varsol product. Third, according to ExxonMobil, Plaintiff's claim that Liquid Wrench caused the decedent to suffer from and die of MM precludes her from establishing the requisite chain of causation to obtain relief from ExxonMobil. The Court will discuss these in turn.

**a. Whether the decedent used Varsol** -- ExxonMobil contends that there is no evidence showing that the decedent used the Varsol product that it manufactured. This contention is not availing. It is true that for a manufacturer to be held liable for a defect in its product, the injured person must have used the product in some manner – in other words, product identification is essential to a claim of product liability. *See Halphen*, 484 So.2d at 113 ("In order to recover from a manufacturer, the plaintiff must prove that the harm [sustained] resulted from the condition of the product . . . ."); *see also Weber*, 250 So.2d at 756 (noting the need to show "a causal relationship between the injuries sustained and the use of the product").

In this case, ExxonMobil has proffered evidence indicating that the decedent did not use the Varsol product that it manufactured while he was employed by Magnaflux in Harvey, Louisiana. In particular, Raymond Lauden, a Magnaflux employee at the time, testified during his deposition that he was responsible for purchasing the solvent that employees used and that he did not purchase Varsol, the product that is manufactured by ExxonMobil. Def.'s Ex. B (Rec. Doc. No. 154-5 at 6, 8-9). There is also evidence that while Magnaflux employees called the solvents that they used "Varsol," it may have been used as a generic term for mineral spirits. *Id.*

36

(Rec. Doc. No. 154-5 at 9); Def.'s Ex. E (Rec. Doc. No. 154-8 at 4).

In response, however, Plaintiff points to the deposition testimony of Wendell Wagoner, who is one of the decedent's brothers and who worked with the decedent at Magnaflux. *See* Pl.'s Ex. F (Rec. Doc. No. 162-7 at 2). During his deposition, Mr. Wagoner stated that he "remember[s] seeing 'Varsol' stamped on the sides of the drums" that contained the chemicals that he and his brother used. *Id.* This evidence, while thin, creates an issue of fact that precludes summary judgment. A reasonable jury viewing the conflicting evidence in the light most favorable to Plaintiff could conclude that the drums, in fact, contained Varsol and that as such, the decedent used the product that is at issue.[7]

In its brief, ExxonMobil argues that the instant case is on all fours with *National Bank of Commerce of El Dorado, Ark. v. Dow Chemical Co.*, 165 F.3d 602 (8th Cir. 1999), where the Eighth Circuit affirmed a grant of summary judgment because the plaintiffs in that case had failed to proffer evidence to support the finding that the product that was allegedly at issue – Spectracide – was in fact used, *see id.* at 606-07. That case, however, is distinguishable. The witness in that case, when asked what product was bought, stated, "Spectracide? Something like that?" *Id.* at 607 n.7. The Eighth Circuit found that the witness was, at best, ambivalent about the

---

[7] In support of its motion, Defendant also relied on an affidavit from Stanton Salathe, the owner of Salathe Oil Company, who attested that he never sold Varsol to Magnaflux. Def.'s Ex. D (Rec. Doc. No. 154-7 at 2). Plaintiff argues that this is not competent summary judgment evidence because Mr. Salathe was not listed as a witness on ExxonMobil's witness list and has not been made available for cross-examination. Meanwhile, Plaintiff has submitted an affidavit from Charles Brias, who attested that he remembers using Varsol at a Magnaflux facility between 1978 and 1980. Pl's Ex. (Rec. Doc. No. 197-1 at 1). ExxonMobil states that this testimony does not create an issue of fact, in part because it is undisputed that the decedent worked at Magnaflux during a different time period. In light of Wendell Wagoner's testimony, it is not necessary for the Court to discuss the utility of these affidavits with respect to the parties' arguments.

identity of the product. *See id.* The same cannot be said in this case.

**b. Whether the decedent read the warnings on Varsol** -- Prior to the LPLA, the Louisiana Supreme Court articulated a specific causation requirement for failure-to-warn claims. The court recognized that "when a manufacturer fails to give adequate warnings or instructions, a presumption arises that the user would have read and heeded such admonitions." *Bloxom*, 512 So.2d at 850. The court also held, however, that the presumption may be rebutted "if the manufacturer produces contrary evidence which persuades the trier of fact that an adequate warning or instruction would have been futile under the circumstances." *Id.* A warning is futile if there is affirmative evidence showing that the injured person did not read any warning or instruction. *Id.* at 850-51.

ExxonMobil argues that in this case, Plaintiff has failed to adduce evidence that the decedent would have heeded an adequate warning. It is true that there is no evidence that the decedent read any labels on the product, but as noted above, the applicable Louisiana law recognizes the presumption that had there been adequate warnings, "the user would have read and heeded [the] admonitions." *Id.* at 850. Unlike the defendant in *Bloxom*, ExxonMobil in this case has not come forward with specific, affirmative evidence showing that the decedent did not read any warnings or instructions. *See id.* Under these circumstances, the presumption holds, and summary judgment on the ground urged by ExxonMobil is not appropriate.

**c. Whether Plaintiff's claim against Radiator precludes causation as to ExxonMobil** -- The last argument raised by ExxonMobil regarding causation is the idea that Plaintiff's claim against Radiator, in and of itself, precludes a finding of causation as to Plaintiff's claim against ExxonMobil. This argument is not convincing. It is true that the Louisiana Supreme Court once

38

suggested that the substantial factor test, which is used in cases involving multiple sources of harm, requires a showing of but-for causation. *See Dixie Drive It Yourself Sys. New Orleans Co., Inc. v. Am. Beverage Co.*, 137 So.2d 298, 302 (La. 1962). Since then, however, the court has clarified that the two are different:

> Cause-in-fact is generally a "but for" inquiry, which tests whether the accident would or would not have occurred but for the defendant's substandard conduct. However, where there are concurrent causes of an accident, the proper inquiry is whether the conduct in question was a substantial factor in bringing about the accident.

*Bonin v. Ferrellgas, Inc.*, 877 So.2d 89, 94 (La. 2004) (citing *Perkins v. Entergy Corp.*, 782 So.2d 606, 611 (La. 2001); *Boykin v. La. Transit Co.*, 707 So.2d 1225, 1230 & n.10 (La. 1998); *Fowler v. Roberts*, 556 So.2d 1, 5 & n.6 (La. 1989) (original hearing)); *accord LeJeune v. Allstate Ins. Co.*, 365 So.2d 471, 475-77 (La. 1978). Thus, cause-in-fact is present when "each of the multiple causes played so important a role in producing the result that responsibility should be imposed upon each item of conduct, even if it cannot be said definitively that the harm would not have occurred 'but for' each individual cause." *Perkins*, 782 So.2d at 612. ExxonMobil's argument is in tension with the basic principle that "[t]here can be more than one legally responsible party" for an injury. *Graves v. Page*, 703 So.2d 566, 570 (La. 1997). Accordingly, its request for summary judgment on this ground must be rejected.

### 4. Summary

In light of the above, ExxonMobil's Motion for Summary Judgment must be granted in part and denied in part. Summary judgment with respect to the claims that Varsol had a manufacturing defect and that it was unreasonably dangerous per se are appropriate. At this time, however, summary judgment as to Plaintiff's warning defect and design defect claims is not

warranted.

**D. Standard of Review for *Daubert* Motions**

      The admissibility of expert testimony is governed by Federal Rule of Evidence 702,

which provides that

> If scientific, technical, or other specialized knowledge will assist the trier
> of fact to understand the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience, training or
> education, may testify thereto in the form of an opinion or otherwise, if (1)
> the testimony is based on sufficient facts or data, (2) the testimony is the
> product of reliable principles and methods, and (3) the witness has applied
> the principles and methods reliably to the facts of the case.

This rule codifies the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals,

Inc.*, 509 U.S. 579 (1993), and *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

      The threshold question in determining whether an individual may offer expert testimony

under Rule 702 is whether the individual has the qualifications to do so. Fed. R. Evid. 702. "Trial

courts have 'wide discretion' in deciding whether or not a particular witness qualifies as an

expert." *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1050 (5th Cir. 1998) (quoting *Ellis v.

K-Lan Co.*, 695 F.2d 157, 162 (5th Cir. 1983)). Under Rule 702, "the expert is viewed, not in a

narrow sense, but as a person qualified by 'knowledge, skill, experience, training or education.'"

Fed. R. Evid. 702 advisory committee's note.

      Apart from determining the qualifications of the expert, the Court must act as a

"gate-keeper" to ensure that the proffered expert testimony is "both reliable and relevant." *Wells

v. SmithKline Beecham Corp.*, 601 F.3d 375, 378 (5th Cir. 2010). "This entails a preliminary

assessment of whether the reasoning or methodology underlying the testimony is scientifically

valid and of whether that reasoning or methodology properly can be applied to the facts in

issue." *Id.* (quoting *Daubert*, 509 U.S. at 592-93). With respect to reliability, the Court's focus "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.

When the admissibility of expert testimony is challenged under *Daubert*, the proponent of the evidence bears the burden of proving that the testimony is reliable and relevant. *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc). To meet this burden, a party cannot simply rely on its expert's assurances that he has utilized generally accepted scientific methodology. *Id.* Rather, some objective, independent validation of the expert's methodology is required. *Id.* In this regard, however, it is not necessary for the proponent of the evidence to prove that "the testimony is factually correct." *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009).

Ultimately, a court's role as a gatekeeper does not replace the adversary system. *Daubert*, 509 U.S. at 596. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* Proper deference is to be accorded to the jury's role "as the arbiter of disputes between conflicting opinions." *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987)). "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Id.* (quoting *Viterbo*, 826 F.2d at 422).

**E. Radiator's Motion to Exclude Dr. Butler and Dr. Saux and for Summary Judgment (Rec. Doc. No. 147) and ExxonMobil's Motion to Exclude Dr. Butler and Dr. Saux and for**

**Summary Judgment (Rec. Doc. No. 156)**

As noted above, Radiator and ExxonMobil have raised substantially similar arguments in their motions to exclude Dr. Butler and Dr. Saux, who have been retained by Plaintiff to offer expert testimony regarding the questions of general causation (whether benzene can cause MM) and specific causation (whether benzene is the cause of the decedent's MM). Defendants have argued that 1) Dr. Butler and Dr. Saux are not qualified to express an expert opinion on these issues and 2) that their testimony as to both general and specific causation is unreliable. In her opposition, Plaintiff argues that 1) Dr. Butler and Dr. Saux have the qualifications to testify as to the issue of general causation and 2) their testimony is reliable.

### 1. Qualifications of Dr. Butler and Dr. Saux as to general causation

The Fifth Circuit has observed that "the most useful and conclusive type of evidence in a case such as this is epidemiological studies." *Brock v. Merrell Dow Pharm., Inc.*, 874 F.2d 307, 311 (5th Cir. 1989), *modified by* 884 F.2d 166 (5th Cir. 1989). Epidemiology is the scientific field that "attempts to define a relationship between a disease [in humans] and a factor suspected of causing it." *Id.* Whether epidemiological studies support an expert's opinion on the question of general causation in a toxic tort case is critical to determining the reliability of the opinion. *See Wells*, 601 F.3d at 380; *Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 197 (5th Cir. 1996). In this case, Defendants challenge the notion that Dr. Butler and Dr. Saux are qualified to parse epidemiological studies to provide an opinion on general causation.

**a. Whether Dr. Butler is qualified** -- Dr. Butler is a hematopathologist and is board-eligible in occupational and environmental medicine. Def.'s Ex. O (Rec. Doc. No. 147-17 at 1-4). In addition, she has a master's degree in public health, which entailed the study of epidemiology.

42

Def.'s Ex. J (Rec. Doc. No. 147-12 at 41). Dr. Butler has also provided medical-legal consulting with respect to occupation-related malignancies for many years. Def.'s Ex. K (Rec. Doc. No. 147-13 at 1). The Court finds that in light of Dr. Butler's education and work experience, she is qualified to provide an opinion on general causation.

In their motions, Defendants stress that Dr. Butler is not an epidemiologist or a toxicologist. However, Rule 702 "embodies a liberal policy towards qualification as an expert." *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1223, 1242 (E.D.N.Y. 1985), *aff'd*, 818 F.2d 187 (2d Cir. 1987). One can have the requisite qualifications to provide expert testimony by virtue of "knowledge, skill, experience, training or education." Fed. R. Evid. 702. Dr. Butler's aforementioned education and work experience make her qualified to provide an opinion on general causation.

**b. Whether Dr. Saux is qualified** -- Dr. Saux is also qualified to provide an opinion on general causation. Although Dr. Saux's experience lies primarily in the treatment of patients, his deposition testimony reveals that he has maintained a substantial interest in epidemiology, one that is directly tied to his work as a treating physician and one that has led him to become familiar with epidemiological studies. Pl.'s Ex. S (Rec. Doc. No. 166-20 at 44-47). Moreover, ExxonMobil has not demonstrated that Dr. Saux does not have the skills or the knowledge to examine epidemiological studies meaningfully. "In keeping with the spirit of [R]ule 702," Dr. Saux "will be considered an expert although obviously he would not be held in the same esteem" as an expert who is, in fact, an epidemiologist. *Agent Orange*, 611 F. Supp. at 1242-43.

**2. Reliability of the testimony as to general causation**

Defendants have raised five arguments with regard to the reliability of the testimony of

Dr. Butler and Dr. Saux as to general causation: 1) their opinion rests on studies that do not show statistically significant findings; 2) their opinion relies on studies that do not examine benzene specifically; 3) their opinion rests on studies that are not published in peer-reviewed journals and are otherwise flawed; 4) their opinion reflects an incomplete review of the relevant literature; and 5) their opinion fails to articulate a biologically plausible mechanism for benzene to cause MM and thus does not meet the Bradford Hill criteria.

    **a. Studies showing statistically significant findings** -- To prevail in a toxic tort case, a plaintiff must show both general causation and specific causation. *See Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 352 (5th Cir. 2007). An opinion on general causation is inadmissible if it rests entirely on studies that do not show statistically significant results. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 145 (1997); *Wells*, 601 F.3d at 380 (noting that the court "has frowned on causative conclusions bereft of statistically significant epidemiological support"); *Allen*, 102 F.3d at 197 (rejecting as unreliable studies that were not statistically significant and were merely "suggestive" of a link).

    In this case, Defendants argue that many of the studies relied upon by Dr. Butler and Dr. Saux do not show statistically significant results. A review of the material indicates that this is true, but only to some extent.[8] While some of the studies do not reveal statistically significant findings, others do. Defendants are correct in calling into question Plaintiff's reliance on the following studies:

---

    [8] This review has been made difficult by the changing list of studies that, according to Plaintiff, provides a reliable basis for an opinion that benzene can cause MM. At oral argument, Plaintiff argued that seven studies support the opinion that there is a causal association between benzene and MM. The Court will therefore focus on these studies.

1. The study in Robert Rinsky, *Benzene and Leukemia: An Epidemiologic Risk Assessment*, 82 Envtl. Health Perspectives 189 (1989), found "a statistically significant excess of deaths from . . . multiple myeloma." Pl.'s Ex. 20 pt. 2 (Rec. Doc. No. 140-23 at 2). However, a follow-up study of the same cohort, Robert Rinsky et al., *Benzene Exposure and Hematopoietic Mortality: A Long-Term Epidemiologic Risk Assessment*, 42 Am. J. Indus. Med. 474 (2002), failed to find a statistically significant elevated risk. Pl.'s Ex. 20 pt. 2 (Rec. Doc. No. 140-23 at 8).

2. The study in Travis Kubale et al., *A Cohort Mortality Study of Chemical Laboratory Workers at Department of Energy Nuclear Plants*, 51 Am. J. Indus. Med. 656 (2008), found a standardized mortality ratio of 3.56, with a confidence interval of 1.43 to 7.33, but this finding was for female workers. Pl.'s Ex. M (Rec. Doc. No. 166-14 at 12). The authors note that "[t]here were no statistically significant elevations reported among males for any specific cancer or non-cancer outcome." *Id.*

3. The study in Belinda Ireland et al., *Cancer Mortality Among Workers with Benzene Exposure*, 8 Epidemiology 318 (1997), found a standardized mortality ratio of 2.3, but with a confidence interval of 0.7 to 9.4. Pl.'s Ex. 20 pt. 4 (Rec. Doc. No. 140-25 at 7). The risk of MM was thus elevated, but not statistically significant. The authors declined to state that their findings gave more weight to the view that benzene exposure and MM are causally related, noting that their study "provides some support for both sides of the debate." *Id.* (Rec. Doc. No. 140-25 at 9).

However, at least two studies have statistically significant findings:[9]

_____

[9] The Court notes that two of seven the studies discussed by Plaintiff at oral argument were not cited by either Dr. Butler or Dr. Saux in their reports. These are Jelle Vlaanderen, *Occupational Benzene Exposure and the Risk of Lymphoma Subtypes*, 119 Env'tl Health

45

1. A relative risk ratio of 2.49, with a confidence interval of 1.21 to 5.13, was found in Jorunn Kirkeleit et al., *Increased Risk of Acute Myelogenous Leukemia and Multiple Myeloma in a Historical Cohort of Upstream Petroleum Workers Exposed to Crude Oil*, 19 Cancer Causes Control 13 (2008). Pl.'s Ex. 20 pt. 7 (Rec. Doc. No. 140-28 at 15).

2. A relative risk of 2.13, with a confidence interval of 1.31 to 3.46, was found in Peter F. Infante, *Benzene Exposure and Multiple Myeloma: A Detailed Meta-Analysis of Benzene Cohort Studies*, 1076 Ann. N.Y. Acad. Sci. 90 (2006). Pl.'s Ex. 20 pt. 6 (Rec. Doc. No. 140-27 at 19).

**b. Studies that examine benzene specifically** -- Defendants argue that the study by Kirkeleit (2008) does not provide an appropriate foundation for the opinion that benzene can cause MM because it looked at exposure to crude oil, and not benzene in particular.[10] It is true that in *Joiner*, the Supreme Court indicated that an expert opinion on general causation should rely on studies that examine the specific agent that is at issue. *See Joiner*, 522 U.S. at 145-46 (1997). Thus, the Court discounted one study that involved exposure to PCB, the agent that was at issue, because the subjects had also been "exposed to numerous [other] potential carcinogens." *Id.* at 146. The situation here is different, however. Kirkeleit (2008) did examine exposure to crude

---

Perspectives 159 (2011); and S.R. Silver et al., *Effect of Follow-Up Time on Risk Estimates: A Longitudinal Examination of the Relative Risks of Leukemia and Multiple Myeloma in a Rubber Hydrochloride Cohort*, 42 Am. J. Indus. Med. 481 (2002). In light of the above, it is not necessary for the Court to determine whether these studies also provide an appropriate basis for the two doctors' opinion on general causation.

[10] Defendants also advance the argument that the studies do not provide a reliable basis for the opinion because they do not examine the use of Varsol or Liquid Wrench in the same occupational context in which the decedent worked. This argument is unavailing. Plaintiff has framed her theory of liability as one that is focused on benzene as a cause of blood disorders, such as MM. Thus, the general causation question in this case is whether benzene can cause MM. In light of this, Plaintiff's focus on studies that examine exposure to benzene and benzene-containing products is appropriate.

oil, but the authors specifically concluded that "occupational exposure to benzene is the most likely candidate for the increased risk" of MM that they found. Pl.'s Ex. 20 pt. 7 (Rec. Doc. No. 140-28 at 18). The study by Kirkeleit (2008) provides an appropriate basis for the experts' opinion.

**c. Studies that are not published in peer-reviewed journals or that are otherwise flawed** -- With respect to the meta-analysis of Infante (2006), Defendants argue in their briefs that the study does not provide a reliable foundation for the opinion of Dr. Butler and Dr. Saux as to general causation because it is not peer-reviewed and because it suffers from various flaws. Neither of these suggestions is persuasive. First, the Supreme Court in *Daubert* made it clear that it is not necessary for a study to be published in a peer-reviewed journal in order for it to provide a reliable basis for an expert opinion. In fact, "[p]ublication (which is but one element of peer review) is not a *sine qua non* of admissibility." *Daubert*, 509 U.S. at 594.

Second, the argument that the meta-analysis is flawed will take the Court far from the realm of *Daubert*. In support of their argument that the Infante (2006) study suffers from serious deficiencies, Defendants have cited to the deposition testimony of their own expert, Dr. Pyatt. For the Court to consider that contention would be to place itself in the middle of the "battle of the experts." *Garner v. Santoro*, 865 F.2d 629, 644 (5th Cir. 1989). The Court at this juncture need not determine that the general causation opinion of Dr. Butler and Dr. Saux is in fact "correct." *Paz*, 555 F.3d at 388. That Dr. Butler and Dr. Saux may have used a study that has weaknesses in rendering their opinion can appropriately be raised through cross-examination and the testimony of Dr. Pyatt. *See Daubert*, 509 U.S. at 596.

**d. Incomplete review of the relevant literature --** Defendants complain that in rendering

their opinion on general causation, Dr. Butler and Dr. Saux ignored studies and other relevant sources that, according to Defendants, undercut their conclusion that benzene can cause MM. This contention is not convincing. To be sure, the fact that an expert has reviewed only some of the available literature raises the possibility that the expert may have reached a conclusion in advance of performing the requisite research. Clearly, this would undercut the reliability of the expert's opinion. *See Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994) (noting that reliability was lacking where experts "formed their opinions before reading the relevant literature"); *see also Mitchell v. Gencorp Inc.*, 165 F.3d 778, 783 (10th Cir. 1999). "Coming to a firm conclusion first and then doing research to support it is the antithesis of [the scientific] method." *Claar*, 29 F.3d at 502-03.

At the same time, however, it is far from clear that an expert must review all of the available studies simply to cross the threshold of admissibility. Under Rule 702, an expert must, at the least, indicate that his or her theory "can be (and has been) tested." *Daubert*, 509 U.S. at 593. In other words, the basic minimum is that there must be some scientific validation of the theory advanced by the expert. *See id.* In view of "the 'liberal thrust' of the Federal Rules [of Evidence] and their 'general approach of relaxing the traditional barriers to opinion testimony,'" *id.* at 588 (quoting *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169 (1988)), the Court finds that the presence of studies that cut against the expert's opinion and that are not accounted for by the expert is a subject for cross-examination, not a barrier to admissibility. *See id.* at 596.[11]

---

[11] To conclude otherwise would risk placing an improper focus on the conclusions reached by an expert witness. *See Daubert*, 509 U.S. at 595 (noting that the focus of the admissibility inquiry "must be solely on principles and methodology, not on the conclusions that they generate"). It would also establish a *Frye*-like requirement that a conclusion must be widely accepted in the relevant scientific community in order for it to be admitted. *See Daubert v.*

In this case, Dr. Butler acknowledged in her report that "[a]ssociation of exposure to benzene and development of multiple myeloma has been much debated in the medical literature." Def.'s Ex. K (Rec. Doc. No. 147-13 at 12). She also discussed studies suggesting the absence of a meaningful association between benzene and MM and explained why she did not give weight to them. *Id.* (Rec. Doc. No. 147-13 at 12-13). Similarly, Dr. Saux stated at his deposition that he took into account studies that *do not* show a statistically significant association between benzene and MM. Def.'s Ex. L (Rec. Doc. No. 147-14 at 34-35). All of this eliminates the possibility that the two doctors reviewed the literature solely with an eye on studies that would support their conclusion. To the extent that they did not take into account every study that is relevant to the question of general causation or otherwise exhibited bias in rendering their opinion, those issues go to the weight of their opinion, and not the question of admissibility. *See 14.38 Acres of Land*, 80 F.3d at 1077.

  **e. Biologically plausible mechanism** -- Defendants argue that the inability of Dr. Butler and Dr. Saux to articulate a biologically plausible mechanism for benzene to cause MM renders their opinion on general causation unreliable. This contention must be rejected. It is true that the set of criteria known as the Bradford Hill criteria has been widely acknowledged as providing an appropriate framework for assessing whether a causal relationship underlies a statistically significant association between an agent and a disease. *In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, 612 F. Supp. 2d 116, 132-33 (D. Mass. 2009); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 137 F. Supp. 2d 147, 168 (E.D.N.Y. 2001) ("Epidemiologists generally look to

---

*Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1319 & n.11 (9th Cir. 1995), *cert. denied*, 516 U.S. 869 (1995) (noting that the key under *Daubert* is whether "a recognized minority" accepts a theory or methodology as valid).

[the Bradford Hill] criteria to determine whether a statistical association is indeed causal."). It is also true that one of the nine criteria is biological plausibility. *Neurontin*, 612 F. Supp. 2d at 133.

However, epidemiologists have recognized that "[t]hese factors are viewed as guidelines" and that "each factor need not be fulfilled in order for a researcher to proclaim causation." *Id.* Unsurprisingly, then, courts have held that an expert's "failure to satisfy the Bradford Hill criteria does not necessarily compel exclusion of an opinion as unreliable." *In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 936, 946 (D. Minn. 2009); *accord Neurontin*, 612 F. Supp. at 133 (noting that "in the context of a general causation challenge, failure to satisfy the Bradford Hill criteria does not doom admission under *Daubert*"). To the extent that Dr. Butler and Dr. Saux are unable to articulate a biologically plausible mechanism for benzene to cause MM, that is an issue that goes to the weight of their opinion, and not the issue of admissibility.

### 3. Reliability of the testimony as to specific causation

Defendants question whether the two doctors' opinion as to specific causation is reliable. According to Defendants, neither adequately dealt with the possibility that the decedent's MM was due to an alternative cause or simply an unknown cause. The Court does not find this suggestion persuasive. To be sure, "[t]he fact that exposure to [a substance] may be a risk factor for [a disease] does not make it an actual cause simply because [the disease] developed." *Guinn v. AstraZeneca Pharm. LP*, 602 F.3d 1245, 1255 (11th Cir. 2010) (quoting *Cano v. Everest Minerals Corp.*, 362 F. Supp. 2d 814, 846 (W.D. Tex. 2005)). Thus, "if an expert utterly fails to consider alternative causes or fails to offer an explanation for why the proffered alternative cause was not the sole cause, a district court is justified in excluding the expert's testimony." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir. 2001). A medical expert need not, however, "rule out

50

every possible alternative cause of a plaintiff's illness." *Id.*

A standard way by which medical experts address the question of specific causation is by performing a differential diagnosis or a differential etiology. *See, e.g.*, *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 758 (3d Cir. 1994) (noting that differential diagnosis is a "technique that has widespread acceptance in the medical community . . . that involves assessing causation with respect to a particular individual"). "In performing a differential diagnosis, a physician begins by 'ruling in' all scientifically plausible causes of the plaintiff's injury. The physician then 'rules out' the least plausible causes of injury until the most likely cause remains." *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001); *see also Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1195 (11th Cir. 2010); *Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171, 178 (6th Cir. 2009).

When the etiology of a disease is often unknown, differential diagnosis may be of less utility. *See, e.g.*, *Bland v. Verizon Wireless, (VAW) LLC*, 538 F.3d 893, 897 (8th Cir. 2008) (questioning the reliability of a causation opinion based on differential diagnosis "[w]here the cause of the condition is unknown in the majority of cases"); *Whiting v. Boston Edison Co.*, 891 F. Supp. 12, 21 n.41 (D. Mass. 1995) (noting that it was doubtful that a differential diagnosis could pinpoint the cause of the decedent's acute lymphocytic leukemia (ALL), given that "90 percent of ALL cases are of unknown cause"). In such circumstances, the physician rendering an opinion on specific causation should, at the least, articulate the reasons why, unlike the majority of cases, the instant case is one in which the cause of the disease can be ascertained.

In this case, it is true that in their reports, both Dr. Butler and Dr. Saux paid relatively little attention to the question of specific causation. Dr. Butler's report devoted two sentences to

alternative causes, discussing only ionizing radiation as an alternative cause of MM. *See* Def.'s Ex. K (Rec. Doc. No. 147-13 at 17). Dr. Saux similarly devoted only one sentence to alternative causes. He wrote that the decedent was not exposed to other potential causes of MM, such as pesticides and radiation. *See* Def.'s Ex. M (Rec. Doc. No. 147-15 at 8). In addition, during his deposition, Dr. Saux conceded that in the majority of cases, the etiology of MM is unknown. Def.'s Ex. L (Rec. Doc. No. 147-14 at 10, 17). Yet, in his report, Dr. Saux did not discuss the possibility that MM in the decedent was the result of an unknown cause.

The deposition testimony of the two doctors, however, alleviates concerns about the adequacy of the two doctors' thought processes with regard to specific causation. It is true that during his deposition, Dr. Saux stated that he was not asked to rule out alternative causes of MM in the decedent. Def.'s Ex. L (Rec. Doc. No. 147-14 at 19). However, he also discussed what he considered to be the recognized causes of MM, *id.* (Rec. Doc. No. 147-14 at 16-17), and specified the reasons why he thought he could rule out those alternative causes and also eliminate the possibility that the etiology of the decedent's MM is unknown, *id.* (Rec. Doc. No. 147-14 at 18, 34). During her deposition, Dr. Butler similarly elaborated on her opinion on specific causation. Def.'s Ex. J (Rec. Doc. No. 147-12 at 24). The Court finds that the experts have not "utterly fail[ed]" to consider the possibility of alternative causes or of an unknown cause. *Cooper*, 259 F.3d at 202. Their opinion on specific causation is therefore not unreliable.

### 4. Summary

None of the arguments raised by Defendants in support of their motions to exclude Dr. Butler and Dr. Saux are persuasive. The two individuals are qualified to render an opinion on general causation, and at least two studies support the notion that there is a statistically significant

association between benzene and MM. The fact that those studies may be flawed, that there are studies that cut against the two doctors' opinion, and that the doctors could not articulate a biologically plausible mechanism for benzene to cause MM all go to the weight of their opinion, and not the question of admissibility. Finally, as to specific causation, the deposition testimony of Dr. Butler and Dr. Saux reveals that they adequately considered the possibility of alternative causes or of an unknown cause. Accordingly, the motions to exclude and for summary judgment must be denied.

**F. Radiator's Motion to Strike the Affidavit of Eric Wagoner and to Exclude Dr. Bhaskar Kura (Rec. Doc. No. 149)**

In this motion, Radiator asks the Court to strike the affidavit of Eric Wagoner, to exclude Dr. Kura's expert testimony, and to grant summary judgment in its favor.

### 1. The affidavit of Eric Wagoner

As noted above, Eric Wagoner is one of the decedent's brothers, and he worked with the decedent in Alabama during the 1970s. In its motion, Radiator argues that there are serious contradictions between the March 2011 affidavit of Mr. Wagoner and the testimony he gave at his deposition in October 2010. In response, Plaintiff contends that Mr. Wagoner's affidavit simply clarifies his deposition testimony. A review of the material indicates that there are inconsistencies between the two and that the affidavit does not merely clarify the deposition testimony. First, during his deposition, Mr. Wagoner testified that there were two fans in the garage at the Phillips service station in Ragland, Alabama, where he and the decedent worked. Def.'s Ex. E (Rec. Doc. No. 149-7 at 9). In his affidavit, however, he states that there were no fans. Def.'s Ex. H (Rec. Doc. No. 149-10 at 1).

Second, during his deposition, Mr. Wagoner declined to indicate how many cans of Liquid Wrench the decedent used on average during either a week or a month. Mr. Wagoner said that it is "hard to say" and that "you couldn't base that on an average." Def.'s Ex. E (Rec. Doc. No. 149-7 at 13). He explained that it "depend[s] on how much work we had going on." *Id.* He further stated that sometimes, "I wasn't even there or whatever, so I mean I don't know what he was using and what he wasn't using." *Id.* (Rec. Doc. No. 149-7 at 14). Later during the deposition, he again stated that "[h]onestly, I couldn't tell you" when he was again asked about the number of cans of Liquid Wrench that were used. *Id.* (Rec. Doc. No. 149-7 at 15). In his affidavit, however, Mr. Wagoner unequivocally states that the decedent "would use an average of 10-12 ounces of Liquid Wrench a day." Def.'s Ex. H (Rec. Doc. No. 149-10 at 1).

Notwithstanding these inconsistencies, the relief requested by Radiator is not warranted. The Fifth Circuit has recognized the sham affidavit doctrine, which provides that an affidavit may be stricken if it contradicts prior deposition testimony without providing an explanation. *See, e.g.*, *Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000). The doctrine applies, however, in the context of summary judgment motions in order to preclude non-movants from "manufactur[ing] a dispute of fact" by contradicting prior deposition testimony. *Id.* The doctrine echoes the authority of the courts under Rule 56 of Civil Procedure to disregard incompetent summary judgment evidence and to sanction the use of affidavits that are submitted in bad faith. *See* Fed. R. Civ. P 56(c)(2), (h).

Here, Radiator is asking the Court to strike an affidavit in order to limit the material that Plaintiff's expert, Dr. Kura, could have considered in rendering his opinion in this case. This request seems contrary to the spirit of the Federal Rules of Evidence. *See* Fed. R. Evid. 703

54

(allowing an expert to base an opinion on facts that are not admissible). In its motion, Radiator

cites to *Adelman-Tremblay v. Jewel Companies, Inc.*, 859 F.2d 517 (7th Cir. 1988), for the

proposition that the sham affidavit doctrine extends to expert witnesses. But in that case, the

affidavit that was at issue was that of the expert himself, who was found to have contradicted his

earlier deposition testimony -- not the affidavit of a fact witness on which an expert relied to

render an opinion in the case. *Id.* at 519-21.

Even if the sham affidavit doctrine were applicable, the inconsistencies between Eric

Wagoner's deposition testimony and his affidavit would not justify striking the affidavit. "Not

every discrepancy between an affidavit and prior deposition testimony indicates a sham." *Ramos*

*v. Geddes*, 137 F.R.D. 11, 12 (S.D. Tex. 1991); *accord Kennett-Murray Corp. v. Bone*, 622 F.2d

887, 894 (5th Cir. 1980). The Fifth Circuit has observed that "[t]o the extent they exist,

discrepancies in those averments present credibility issues properly put to the trier-of-fact."

*Dibidale of La., Inc. v. Am. Bank & Trust Co.*, 916 F.2d 300, 307 (5th Cir. 1990). In this case,

Radiator is free to use these inconsistent statements to call into question the credibility of Eric

Wagoner and to cast doubt on Dr. Kura's opinion. The Court will not, however, strike the

affidavit of Eric Wagoner.

### 2. Exclusion of Dr. Kura

Radiator has moved the Court to exclude Dr. Kura's opinion regarding the decedent's

exposure to benzene as a result of using Liquid Wrench. Radiator argues that Dr. Kura's opinion

is either irrelevant or unreliable because 1) his calculation of the amount of benzene in Liquid

Wrench rests on an invalid test and 2) he otherwise assumes facts about the decedent's working

conditions that are not supported by the available evidence.

55

**a. Calculation of the amount of benzene in Liquid Wrench** – It is undisputed in this case that a test conducted on October 4, 1977 showed that the benzene content of Liquid Wrench was 30 percent, but that a subsequent test conducted on October 18, 1977 revealed a benzene content of 7 percent. Def.'s Ex. J (Rec. Doc. No. 149-12 at 3, 5). In its motion, Radiator takes issue with Dr. Kura's decision to use the 30 percent figure as one of the values to reach the finding that Liquid Wrench has, on average, a benzene content of 13.81 percent. Radiator notes that during his deposition, Dr. Kura stated that a test result must be replicated in order for it to be valid and that Dr. Kura conceded that the 30 percent result was not replicated. Def.'s Ex. D (Rec. Doc. No. 149-6 at 48, 57). Radiator argues that Dr. Kura failed to abide by his own methodology.

Radiator's argument has some force, but during his deposition, Dr. Kura indicated that the 7 percent figure was also not replicated and that, as a result, it was proper for him to take both figures into account. *See id.* (Rec. Doc. No. 149-6 at 51). Radiator has not otherwise argued that this explanation contravenes scientifically valid principles or methods. As a result, at this time, Radiator has not shown that Dr. Kura's calculation of the amount of benzene in Liquid Wrench is so unreliable that it should not be made available to the jury. Radiator remains free to call into question the soundness of Dr. Kura's calculation through cross-examination and the presentation of contrary testimony.

**b. Facts about the decedent's work --** When an expert applies his methodology to the facts of the case, a district court must ensure that the expert opinion is not "based on facts that are indisputably wrong." *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996). "Expert evidence based on a fictitious set of facts is just as unreliable as evidence based upon no research at all. Both analyses result in pure speculation." *Id.* At the same time, however, it is axiomatic

56

that if the record supports competing facts, an expert's decision to accept one set of facts over another does not constitute grounds for excluding the expert's testimony. *See* Fed. R. Evid. 702 advisory committee's note ("When facts are in dispute, experts sometimes reach different conclusions on competing versions of the facts.").

In this case, Radiator argues that in assessing the decedent's exposure to benzene as a result of using Liquid Wrench, Dr. Kura assumed a number of facts about the decedent's work that are not supported by the record. A review of the material indicates that the facts underlying Dr. Kura's calculations find some support in the evidentiary material.

**i. Work starting in 1972** -- First, Radiator states that Dr. Kura erroneously assumed that the decedent began working at the Phillips service station in 1972. It is true that Eric Wagoner testified at his deposition that his first job was at the Phillips station with the decedent and that he began working there in 1976. Def.'s Ex. D (Rec. Doc. No. 149-7 at 3, 7). However, Mr. Wagoner has also provided an affidavit in which he states that he worked with the decedent starting from 1972. Pl.'s Ex. J (Rec. Doc. No. 170-11 at 6). While these inconsistent statements certainly cast doubt on the credibility of Mr. Wagoner, it indicates that Dr. Kura's assumption is grounded in evidentiary material.

**ii. Liquid Wrench on hands** -- Second, Radiator states that Dr. Kura erroneously assumed that the decedent had Liquid Wrench on his hands every 15 minutes. In his report, Dr. Kura did make this assumption. Def.'s Ex. G (Rec. Doc. No. 149-9 at 27). Radiator acknowledges, however, that during his deposition, Mr. Wagoner testified that he and the decedent often had Liquid Wrench on their hands and that they would try to wipe the substance off. Def.'s Ex. E (Rec. Doc. No. 149-7 at 18). The fact that the decedent tried to wipe off Liquid

Wrench is not inconsistent with Dr. Kura's assumption that the substance came into contact with the decedent's hands every 15 minutes. To the extent that this assumption is shaky, it is a subject for cross-examination.

**iii. Amount of Liquid Wrench used** -- Third, Radiator states that Dr. Kura erroneously assumed that on average, the decedent used 10 ounces of Liquid Wrench per day during weekdays. As Radiator also acknowledges, however, this figure is reflected in Eric Wagoner's post-deposition affidavit. *See* Def.'s Ex. H (Rec. Doc. No. 149-10 at 1). It is therefore supported by evidentiary material. To the extent that Eric Wagoner's statement seems implausible in light of the other evidence in the case, that may properly be addressed via cross-examination.

**iv. Ventilation at workplace** -- Fourth, Radiator states that Dr. Kura failed to take into account deposition testimony indicating that there were fans in the garage and that doors may have been occasionally open. Again, Eric Wagoner has stated in his post-deposition affidavit that there were no fans in the garage. *See id.* Moreover, Dr. Kura stated in his report that he adjusted the ventilation rate to account for "occasional door opening." Def.'s Ex. G (Rec. Doc. No. 149-9 at 21). The discrepancies in testimony regarding the presence of fans is a topic for cross-examination. Similarly, to the extent that Dr. Kura did not adequately adjust the ventilation rate to take into account the opening of the doors, that is a subject that can be addressed through cross-examination.

**v. Use of Liquid Wrench in 1978** -- Fifth, Radiator argues that Dr. Kura erroneously assumed that the Liquid Wrench was used through 1978 because it removed benzene from its Liquid Wrench formula in mid-1978. In his report, however, Dr. Kura adjusted for the change in production, stating that only the first half of 1978 would be used to calculate the decedent's

exposure to benzene. *Id.* (Rec. Doc. No. 149-9 at 27). Even if Dr. Kura had not made the adjustment, he explained that the decedent likely would have continued to use the Raffinate version of Liquid Wrench through 1978 as it would have taken time for the new, benzene-free version to be distributed in the market. *Id.* Radiator has not suggested that this assumption is incorrect or otherwise so unreasonable that it is pure speculation.

**vi. Type of Liquid Wrench used** -- Sixth, according to Radiator, Dr. Kura erroneously assumed that when Eric Wagoner stated that the decedent used Liquid Wrench, he was referring to the Raffinate formula of Liquid Wrench, and not the aerosol version of the product. Radiator points out that during his deposition, Eric Wagoner testified that both types of Liquid Wrench were used, but he could not state which was used more often. Def.'s Ex. E (Rec. Doc. No. 149-7 at 16). However, there is also testimony from Wendell Wagoner indicating that the aerosol can of Liquid Wrench was not used. Pl.'s Ex. A (Rec. Doc. No. 170-2 at 9, 12). Again, Dr. Kura's assumption finds support in the record.

**vi. Distance between the decedent's nose and the application point** -- Seventh, and finally, Radiator briefly suggests that Dr. Kura erroneously assumed that the decedent's face was "within 12 inches" of the bolts on which Liquid Wrench was applied. Plaintiff correctly points out that Dr. Kura, in fact, assumed a distance of 18 inches. Def.'s Ex. G (Rec. Doc. No. 149-9 at 21). And during his deposition, Dr. Kura explained that he grounded this assumption in the deposition testimony of the decedent's brothers, who described the way in which they worked on different parts of vehicles. Def.'s Ex. D (Rec. Doc. No. 149-6 at 66). Radiator has not argued that Dr. Kura's assumption is "indisputably wrong," *Guillory*, 95 F.3d at 1331, or otherwise so inconsistent with the available evidence that it renders his exposure assessment inadmissible.

### 3. Summary

While the record reveals inconsistencies in the testimony of the decedent's brothers and thus raises questions of credibility, those are subjects for cross-examination and do not warrant either striking the affidavit of Eric Wagoner or excluding the testimony of Dr. Kura. Accordingly, the Court finds it appropriate to deny Radiator's motion.

### G. ExxonMobil's Motion to Exclude Dr. Kura (Rec. Doc. No. 151)

As noted above, Dr. Kura has also been retained by Plaintiff to provide expert testimony to support her claims against ExxonMobil. More specifically, Dr. Kura was asked to render an opinion regarding 1) the adequacy of the warnings for Varsol and 2) the decedent's exposure to benzene as a result of the alleged use of Varsol. In its motion, ExxonMobil asks the Court to exclude Dr. Kura's testimony in all respects.

### 1. Dr. Kura's testimony regarding warnings on Varsol

As to the adequacy of the Varsol warnings, ExxonMobil argues that 1) Dr. Kura is not qualified to render an opinion on product labeling and 2) Dr. Kura did not identify or apply any appropriate methodology in concluding that the warnings are inadequate.

**a. Dr. Kura's qualifications** -- ExxonMobil has raised substantial questions regarding whether Dr. Kura is qualified to render an opinion on the adequacy of the warnings on Varsol. Dr. Kura has experience in environmental engineering and related fields. *See* Def.'s Ex. A (Rec. Doc. No. 151-2 at 2-8). Dr. Kura's CV does not reveal, however, any prior experience with product labeling. *See id.* It does not show that Dr. Kura has had experience designing, writing, researching, or evaluating product labels, and it is unclear whether Dr. Kura has had any prior experience serving as an expert witness on the question of product labeling. *See id.* Bearing in

60

mind, however, Rule 702's "liberal policy towards qualification as an expert," *Agent Orange*, 611 F. Supp. at 1242, the Court finds it appropriate to reserve ruling on this particular question until there is an opportunity for Dr. Kura to speak to this issue in court.

**b. Methodology behind Dr. Kura's conclusion** -- ExxonMobil has also raised substantial questions as to the adequacy of Dr. Kura's opinion regarding the warnings on Varsol. As noted above, Dr. Kura in his report opined that Varsol's label should have mentioned benzene and the risk of blood disorders. However, Dr. Kura;s discussion of the Varsol label is terse. *See id.* (Rec. Doc. No. 151-2 at 13, 19-20). A number of factors are relevant in determining the adequacy of a label, including "the severity of the danger, the likelihood that the warning will catch the attention of those who will foreseeably use the product and convey the nature of the danger to them, the intensity and form of the warning, and the cost of improving the strength or mode of the warning." *Bloxom*, 512 So.2d at 844. In his report, Dr. Kura did not discuss any of these factors. At this time, however, having reserved the question of whether Dr. Kura is qualified to render an opinion on the adequacy of Varsol's warnings, the Court also finds it appropriate to reserve ruling on the issue of whether Dr. Kura's opinion is sufficiently reasoned to pass muster under *Daubert*.

**2. Dr. Kura's assessment of the decedent's exposure to benzene**

With respect to Dr. Kura's assessment of the decedent's exposure to benzene as a result of Varsol, ExxonMobil has advanced several arguments. In particular, ExxonMobil asserts that Dr. Kura's opinion is not reliable because there is no evidence that the decedent actually used Varsol. ExxonMobil also contends that Dr. Kura's assessment is unreliable because he erroneously assumed that Dr. Kopstein's calculation of the average exposure concentration of benzene from

Varsol represents a time-weighted average. None of these arguments are convincing.[12]

**a. The decedent's use of Varsol** --  With respect to the argument that there is no evidence that the decedent actually used Varsol, the previous discussion of this contention makes it clear that it does not take ExxonMobil very far. During his deposition, Wendell Wagoner testified that he recalls seeing the word "Varsol" stamped on the side of the drums containing the solvents that he and the decedent used while working at Magnaflux. *See* Pl.'s Ex. F (Rec. Doc. No. 162-7 at 2). As such, Dr. Kura's assumption that the decedent was exposed to benzene as a result of using Varsol cannot be said to reflect a fact that is "indisputably wrong." *Guillory*, 95 F.3d at 1331. It bears repeating that experts may not be excluded simply because they rely on a set of facts that are in dispute. *See* Fed. R. Evid. 702 advisory committee's note.

**b. The assumption that Dr. Kopstein's calculation of the average exposure concentration of benzene represents a time-weighted average** -- In its motion, ExxonMobil argues that Dr. Kura erroneously assumed that the average exposure concentration of 12.4 ppm calculated by Dr. Kopstein represents a time-weighted average. This argument is not persuasive. In his deposition, Dr. Kopstein explained that the figure of 12.4 ppm represents the notion that if there is partial evaporation of Varsol, thereby resulting in an airborne level of a total of 100 ppm of hydrocarbons, the average benzene content in the air at that time would be 12.4 ppm. Def.'s Ex. G (Rec. Doc. No. 151-8 at 4).

Thus, in arguing that Dr. Kura should not have assumed that this figure can be applied as

---

[12] As noted above, ExxonMobil has also argued that if the Court grants its separate motion to exclude Dr. Melvyn Kopstein, then Dr. Kura's testimony must be excluded. As discussed below, ExxonMobil's motion to exclude Dr. Kopstein is to be denied. This contention is therefore unavailing.

an eight-hour, time-weighted average, ExxonMobil is, in effect, contending that there are insufficient facts for Dr. Kura to have assumed that the decedent's work involved the partial evaporation of Varsol during eight hours a day. As Plaintiff notes, however, there is testimony from the decedent's brothers that seem to support the assumption that there was partial evaporation of Varsol for that amount of time. *See, e.g.*, Pl.'s Ex. A (Rec. Doc. No. 171-2 at 19-20). Dr. Kura's reliance on this testimony suggests that his analysis is grounded in the available evidence. To the extent that ExxonMobil finds this to be shaky, it can be addressed through cross-examination.

### 3. Summary

ExxonMobil has raised substantial questions as to whether Dr. Kura is qualified to render an opinion on the adequacy of Varsol's labels, whether his opinion is sufficiently reasoned to pass muster under *Daubert*, and whether, in light of these considerations, summary judgment as to Plaintiff's warning defect claim is warranted. The Court finds it appropriate, however, to reserve ruling on these questions. As to Dr. Kura's assessment of the decedent's exposure to benzene as a result of his alleged use of Varsol, the Court finds none of ExxonMobil's arguments to be persuasive. Accordingly, that portion of ExxonMobil's motion must be denied.

### H. ExxonMobil's Motion to Exclude Dr. Melvyn Kopstein (Rec. Doc. No. 150)

As noted above, Dr. Kopstein has been retained by Plaintiff to provide an opinion on the benzene content of Varsol. In its motion, ExxonMobil advances three arguments in support of its request to exclude Dr. Kopstein. None are convincing.

First, ExxonMobil stresses that some of the opinions expressed by Dr. Kopstein are not appropriate topics for expert testimony. At this juncture, the Court does not find this to be a

reason to exclude Dr. Kopstein entirely from testifying at trial. It is clear that Dr. Kopstein may testify that the absence of certain material precludes him from validating certain testing methods or results regarding the amount of benzene in Varsol. To the extent that, at trial, Dr. Kopstein does attempt to testify as to subjects that are beyond his area of expertise, ExxonMobil is free to raise objections at the appropriate time, and the Court will consider them in that context. The concerns raised by ExxonMobil are best addressed at trial, in "the real world of an actual speaker and a specific statement." *Rojas v. Richardson*, 703 F.2d 186, 188 (5th Cir. 1983).

Second, ExxonMobil notes that Dr. Kopstein was not present at the time that certain tests were undertaken in order to determine the benzene content of Varsol. ExxonMobil contends that as a consequence, Dr. Kopstein cannot opine on the validity of the testing. The only case that ExxonMobil cites in support of this curious argument is *Saudi v. S/T Marine Atlantic*, 159 F. Supp. 2d 512 (S.D. Tex. 2001). That case, however, does not stand for the proposition that an expert must always be personally present at a test in order to be able to comment on its validity. There, the court found the testimony to be unreliable not only because the witness had not observed the test, but also because he had failed to "present any facts or data to support his conclusion." *Id.* at 516. The same cannot be said here. In his report, Dr. Kopstein set forth specific reasons to support his opinion regarding the validity of ExxonMobil's testing of Varsol. *See, e.g.*, Def.'s Ex. A (Rec. Doc. No. 150-2 at 24-25). Dr. Kopstein's view is admissible, and the appropriate means of countering it is through cross-examination and the presentation of contrary testimony.

Third, as to Dr. Kopstein's own determination of the benzene content of Varsol, ExxonMobil states that Dr. Kopstein employed an unreliable methodology. ExxonMobil notes

64

that Dr. Kopstein determined the amount of benzene in Varsol not by testing the product but by

reviewing various literature regarding mineral spirits. This contention is also unavailing. In his

report, Dr. Kopstein explained that based on his understanding of the way in which Varsol is

manufactured, he found that Varsol is a mineral spirit and suggested that, as a result, it is

appropriate to refer to peer-reviewed literature examining the benzene content of mineral spirits.

*Id.* (Rec. Doc. No. 150-2 at 36). And, as noted above, Dr. Kopstein further explained why he

rejected the results of the tests done by or on behalf of ExxonMobil. To the extent that Dr.

Kopstein's opinion is shaky, the appropriate way to challenge it is through cross-examination and

the presentation of contrary evidence.[13]

Because none of the arguments advanced by ExxonMobil in support of its Motion to

Exclude Dr. Kopstein are persuasive, the motion must be denied.

**I. Radiator's Motion to Exclude Dr. Kopstein (Rec. Doc. No. 152)**

As discussed above, Dr. Kopstein was retained by Plaintiff to render an opinion in

connection with her claims against ExxonMobil. Radiator has filed a separate motion asking that

Dr. Kopstein be precluded from providing testimony regarding Liquid Wrench and/or Radiator. In

her response, Plaintiff has indicated that Dr. Kopstein will not offer an opinion regarding Liquid

Wrench and/or Radiator. Accordingly, this motion must be denied as moot.

**J. Plaintiff's Motion to Exclude Dr. Pyatt (Rec. Doc. No. 140) and Plaintiff's Motion to**

**Exclude Dr. Monson and Dr. Natelson (Rec. Doc. No. 141)**

---

[13] ExxonMobil also briefly argues that Dr. Kopstein erroneously assumed in his report
that the decedent used Varsol at his workplace. As discussed above, there is evidence supporting
the finding that the decedent used Varsol. As a result, that assumption is not "indisputably
wrong." *Guillory*, 95 F.3d at 1331.

Dr. David Pyatt is a toxicologist, Dr. Richard Monson is an epidemiologist, and Dr. Ethan Natelson is a hematologist. These doctors have been retained by Defendants to provide an opinion on the question of general and specific causation. Plaintiff has filed two separate motions challenging the admissibility of their opinion, but the two motions raise essentially the same contentions.

In her motions, Plaintiff contends that the doctors' opinion that there is insufficient epidemiological evidence for the proposition that benzene can cause MM should be excluded because it is unreliable. According to Plaintiff, some of the studies relied upon by the doctors do not mention benzene or MM, and those studies that do discuss benzene do not involve a quantitative evaluation of benzene exposure. Plaintiff also stresses that the doctors otherwise ignored studies that find a statistically significant relationship between benzene and MM. Separately, with respect to specific causation, Plaintiff asks that the three doctors be precluded under Rule 37 of Civil Procedure from providing testimony on subjects not covered by their expert reports – in particular, the link between obesity and MM.

The Court does not find either set of arguments to be persuasive. With respect to the reliability of the doctors' opinion on the question of general causation, it should be noted that Plaintiff has made largely the same arguments that Defendants have made vis-à-vis Plaintiff's general causation experts. A review of the reports of Dr. Pyatt, Dr. Monson, and Dr. Natelson clearly shows that they considered many of the same studies that Plaintiff's experts examined, including ones that do and do not show a statistically significant association between benzene and MM. *See, e.g.*, Pl.'s Ex. 1 (Rec. Doc. No. 140-3 at 9); Pl.'s Ex. A (Rec. Doc. No. 141-3 at 24, 35); Pl.'s Ex. B (Rec. Doc. No. 141-4 at 5). The fact that these three doctors may have overlooked or

given little weight to studies that may cut against their testimony and the fact that the doctors may have relied on studies that do not actually focus on benzene or MM go to the weight of their testimony, and not the question of admissibility.

With respect to Dr. Pyatt's proposed testimony regarding the link between obesity and MM, it should be noted that under Rule 37, expert testimony is not to be excluded if there is no prejudice to the opposing party. *See, e.g.*, *Barrett v. Atl. Richfield Co.*, 95 F.3d 375, 380 (5th Cir. 1996). As Defendants have noted, the subject of obesity was discussed at Dr. Pyatt's deposition, and an offer was made to have Dr. Pyatt be re-deposed. Moreover, given that the trial date has been continued for about three months, there is ample time for Plaintiff to re-depose Dr. Pyatt and to prepare rebuttal testimony. The Court cannot find the degree of prejudice that might otherwise warrant the exclusion of Dr. Pyatt's testimony. Finally, with respect to Dr. Monson and Dr. Natelson, Defendants have clarified in their response that neither of these doctors intends to offer an opinion regarding obesity.

In light of the above, Plaintiff's Motion to Exclude Dr. Pyatt must be denied, and Plaintiff's Motion to Exclude Dr. Monson and Dr. Natelson must be denied in part and denied as moot in part.

**K. Plaintiff's Motion to Exclude Mr. Spencer (Rec. Doc. No. 141)**

As noted above, Mr. Spencer is an industrial hygienist who has been retained by Defendants primarily to assess the decedent's exposure to benzene as a result of the alleged use of Liquid Wrench and Varsol. Plaintiff seeks to exclude Mr. Spencer's testimony with respect to both Defendants. None of the arguments presented by Plaintiff are persuasive.

**1. Exposure assessment with respect to Liquid Wrench**

Plaintiff's first contention with regard to Mr. Spencer's exposure assessment for Liquid Wrench is that he erred in disregarding an October 27, 1978 estimate of benzene exposure that was apparently made in a facility manufacturing Liquid Wrench. As Radiator notes in its brief, however, Mr. Spencer, during his deposition, adequately explained this aspect of the analysis. Mr. Spencer indicated that he gave no weight to that assessment because the amount of exposure in a manufacturing facility is likely to be different from the amount of exposure in a setting where the product is used by the end-user. Def.'s Ex. A (Rec. Doc. No. 181-1 at 10-11). Plaintiff has not otherwise argued that Mr. Spencer's reasoning is inconsistent with basic tenets of industrial hygiene.

Second, Plaintiff takes issue with Mr. Spencer's criticism of Dr. Kura's decision to use the October 4, 1977 test – which, as noted above, showed that the benzene content of Liquid Wrench is 30 percent – in calculating the average amount of benzene in the Liquid Wrench product. In his report, however, Mr. Spencer explained that a test result must generally be replicated in order to be valid and that a subsequent attempt at replicating the 30 percent result was not successful. Pl.'s Ex. A (Rec. Doc. No. 135-3 at 19). Again, Mr. Spencer adequately explained this aspect of his analysis.

Third, Plaintiff argues that Mr. Spencer made incorrect assumptions regarding the facts surrounding the decedent's use of Liquid Wrench. This is the same type of argument that Radiator has made vis-à-vis Dr. Kura. As the discussion with respect to Dr. Kura amply demonstrates, the record in this case reveals competing facts regarding the decedent's use of Liquid Wrench while he was in Alabama. That Mr. Spencer may have relied on a set of facts that Dr. Kura declined to use is not grounds for excluding the testimony of Mr. Spencer.

68

Finally, with respect to Mr. Spencer's criticism of Dr. Kura's dermal exposure assessment, Radiator correctly notes that in his report, Mr. Spencer also adequately explained his conclusion as to why such an assessment cannot be taken. According to Mr. Spencer, the field of industrial hygiene has yet to recognize a standardized way of conducting a dermal exposure assessment. *Id.* (Rec. Doc. No. 135-3 at 8). To the extent that, in a prior case, Mr. Spencer did make such an assessment, Plaintiff is free to address that through cross-examination.

**2. Exposure assessment with respect to Varsol**

With regard to ExxonMobil, Plaintiff first takes issue with Mr. Spencer's opinion regarding the amount of benzene in Varsol. As Plaintiff has acknowledged, this is a heavily contested issue in this case. Mr. Spencer's decision to rely on certain material, and not others, to opine on this question is a subject that can be raised through cross-examination. Second, Plaintiff complains that in his report, Mr. Spencer criticized Dr. Kura for assuming that the figure of 12.4 ppm – calculated by Dr. Kopstein – represents a time-weighted average. In light of the discussion above, it is clear that Mr. Spencer's disagreement with Dr. Kura reflects the different ways in which they have understood the circumstances surrounding the decedent's work at Magnaflux. *See* Pl.'s Ex. B (Rec. Doc. No. 135-4 at 12). This is not a reason for excluding Mr. Spencer's testimony.

Finally, in his report, Mr. Spencer briefly touched upon the question of general causation, and Plaintiff has made the contention that Mr. Spencer is not qualified to render an opinion on that subject. This suggestion is unavailing. As ExxonMobil notes, Mr. Spencer, as an industrial hygienist, has knowledge and training in the fields of epidemiology and toxicology. His opinion on general causation, as his report illustrates, rests on his review of industrial hygiene references.

*See id.* (Rec. Doc. No. 135-4 at 4). In light of Rule 702's "liberal policy towards qualification as an expert," *Agent Orange*, 611 F. Supp. at 1242, it is clear that Mr. Spencer is qualified to provide an opinion on this subject.

Because none of the arguments made by Plaintiff in support of her request to exclude Mr. Spencer from testifying are persuasive, her motion must be denied.

## IV. CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Radiator's Motion for Summary Judgment (Rec. Doc. No. 145) is **GRANTED IN PART AND DENIED IN PART** as set forth herein; Plaintiff's Motion for Partial Summary Judgment (Rec. Doc. No. 139) is **DENIED**; ExxonMobil's Motion for Summary Judgment (Rec. Doc. No. 154) is **GRANTED IN PART AND DENIED IN PART** as set forth herein; Radiator's Motion to Exclude Dr. Butler and Dr. Saux and for Summary Judgment (Rec. Doc. No. 147) is **DENIED**; ExxonMobil's Motion to Exclude Dr. Butler and Dr. Saux and for Summary Judgment (Rec. Doc. No. 156) is **DENIED**; Radiator's Motion to Strike the Affidavit of Eric Wagoner, to Exclude Dr. Kura, and for Summary Judgment (Rec. Doc. No. 149) is **DENIED**; ExxonMobil's Motion to Exclude Dr. Kura and for Summary Judgment (Rec. Doc. No. 151) is **DEFERRED IN PART AND DENIED IN PART** as set forth herein; ExxonMobil's Motion to Exclude Dr. Kopstein (Rec. Doc. No. 150) is **DENIED**; Radiator's Motion to Exclude Dr. Kopstein (Rec. Doc. No. 152) is **DENIED AS MOOT**; Plaintiff's Motion to Exclude Dr. Pyatt (Rec. Doc. No. 140) is **DENIED**; Plaintiff's Motion to Exclude Dr. Monson and Dr. Natelson (Rec. Doc. No. 141) is **DENIED IN PART AND DENIED AS MOOT IN PART** as set forth herein; and Plaintiff's Motion to Exclude Mr. Spencer (Rec. Doc. No. 135) is **DENIED**.

**IT IS FURTHER ORDERED** that with respect to Radiator, Plaintiff's remaining AEMLD claim, as well as her claims of fraudulent misrepresentation and fraudulent suppression, are hereby **DISMISSED** with prejudice. Plaintiff's remaining claims against Radiator are her claims of negligence and wantonness.

**IT IS FURTHER ORDERED** that Plaintiff's manufacturing defect claim and unreasonably dangerous per se claim against ExxonMobil are hereby **DISMISSED** with prejudice. Plaintiff's remaining claims against ExxonMobil are her claims of warning defect and design defect. The Court reserves ruling on the question of whether Dr. Kura is qualified to render an opinion on product labeling, whether his opinion on that subject is reliable, and whether, in light of these considerations, summary judgment as to the warning defect claim is appropriate.

New Orleans, Louisiana, this 24th day of August, 2011.

UNITED STATES DISTRICT JUDGE